Filed 1/20/21  P. v. Warner CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RYAN SCOTT WARNER,<br><br>        Defendant and Appellant. | A152049<br><br>(Napa County<br>Super. Ct. No. CR169461) |

Three-year-old Kayleigh Slusher was so badly beaten that her small intestine ruptured.  She died from the resulting sepsis.  A jury found Ryan Scott Warner, who lived with Kayleigh and her mother, guilty of murder with the special circumstance of torture as well as assault resulting in the death of a child under eight years old.  A separate jury found Kayleigh's mother, Sara Lynn Krueger, guilty of the same charges.[1]  On appeal, Warner argues that there was no substantial evidence that he acted with the intent to torture and intent to kill required for his conviction for murder and the finding of the special circumstance.  He also argues that the prosecutor misstated the law in closing argument and his trial counsel was ineffective in failing to object.  In addition, he raises several challenges regarding jury instructions and

---

[1] We address Krueger's appeal of her conviction in an opinion issued this day.  (*People v. Krueger* (Jan. 20, 2021, A152087) [nonpub. opn.]).

argues that the trial court's response to a jury question about the special circumstance allowed the jury to improperly find the special circumstance. He asks us to reverse his convictions on all counts, or at least the murder count, and asks that if we affirm the murder conviction, we reverse the special circumstance finding. We conclude that the record does not contain substantial evidence to support the finding that Warner acted with the intent to kill, and therefore we reverse the special circumstance finding and remand for resentencing. We affirm the judgment in all other respects.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.    Charges**

In November 2015, the Napa County District Attorney filed an information charging Warner and Krueger with two counts: murder, with the special circumstance of torture (Pen. Code,[2] §§ 187, subd. (a), 190.2, subd. (a)(18); count 1), and assault resulting in death of a child under eight years old (§ 273ab, subd. (a);[3] count 2). The prosecution did not seek the death penalty.

The case was prosecuted under the theory that the murder was by torture, and that Warner directly committed the crimes, or aided and abetted Krueger in committing them. The cases against Warner and Krueger were tried to separate juries in the spring of 2017. Both juries were in attendance

---

[2] All undesignated statutory references are to the Penal Code.

[3] Section 273ab, subdivision (a) provides: "Any person, having the care or custody of a child who is under eight years of age, who assaults the child by means of force that to a reasonable person would be likely to produce great bodily injury, resulting in the child's death, shall be punished by imprisonment in the state prison for 25 years to life. Nothing in this section shall be construed as affecting the applicability of subdivision (a) of Section 187."

for the presentation of most of the evidence, but the juries heard separate opening statements and closing arguments and received separate jury instructions.[4]

## B.    Prosecution Case

### 1.    *February 1, 2014:  Kayleigh's Body is Found*

Warner's friend Antonio Valdez testified that for about two days, starting on the afternoon of January 30, 2014, he received texts and calls from Warner, who claimed to need his help for an unspecified emergency.  At about 12:30 on the morning of February 1, Valdez and his brother drove to Krueger's apartment complex and met with Krueger and Warner.  Warner said that Kayleigh had drunk poison or bleach and was dead.  Valdez did not want to be involved.  He became angry and told them to call the police.  Warner said they were about to discuss doing that.  Valdez left, and later contacted Warner, asking whether he had called the police.  Warner again told him that they were going to discuss doing that.  After a few hours, Valdez realized that Warner was not going to call the police, so he called them himself.

In the early afternoon of February 1, Napa Police Officer Robert Chambers went to Krueger's apartment in response to a telephone tip.  He obtained a key, entered the apartment, which was filled with a smoky haze, and discovered Kayleigh's body in her bed under blankets.  Only her face was visible; it looked bruised, and there was blood coming from her nostrils.  It

---

[4] Warner's jury was sworn on April 27, 2017, heard opening statements on May 1, heard testimony and viewed evidence from May 2 through 22, was instructed and heard closing arguments and began deliberations on May 25, and reached its verdict on May 30.

appeared that Kayleigh had been dead for some time, and her skin was "ice-cold."

The forensic specialist who processed the crime scene testified that the apartment was dark, dirty, disorganized, and smelled strongly of marijuana. The curtains and shades were closed, and extra fabric around the windows had been taped to the wall. There were three latex gloves on the floor. In the kitchen there were dirty dishes in the sink, empty food containers, and containers of partly-eaten food. The freezer itself was empty of food, and its shelving unit had been removed. A later search of the apartment revealed paraphernalia related to the use of marijuana and methamphetamine.

The coroner's investigator who examined Kayleigh's body in the apartment testified that there were bruises all over the body and that the pattern of lividity was inconsistent with the body's position. If Kayleigh had been in that position at the time of death, the lividity would have been on the back of her body; instead, it was on the right side in the front.[5]

An attempt by police to "ping" Krueger's cell phone to locate her that day was unsuccessful, indicating that her phone was turned off.

2. *Before June 2013: Krueger's Relationships with Warner and with Jason Slusher*

Krueger testified that she and Warner met during the summer of 2005, when she was 15 and he was 17; she fell in love with him; they used methamphetamine together; and they had a brief relationship until Warner moved away at the end of the summer.

---

[5] The investigator explained that once the heart stops beating, gravity takes the blood to the bottom of the body, and that Kayleigh's body was found on its back with the legs bent slightly to the right, with one arm across the abdomen and the other by her side.

When Krueger was 16, she met Jason Slusher (Jason)[6] at a "drug house," where people got together to use drugs. They became intimate, and when Krueger was 17 she moved in with Jason and his parents and lived with them for a couple of years. Later, Jason and Krueger got their own apartment, where they were living when their daughter Kayleigh was born in May 2010. Jason's mother testified that both Krueger and Jason had short tempers. They would argue often, with violence on both sides. One time Krueger hit Jason in the head with a two-by-four, and Jason responded by slamming the car door on Krueger's arm. Krueger's friend Allen Epperson, who spent time with Krueger and Jason, saw them arguing and recalled a time when Jason threw something at Krueger, who then pulled a knife out at him.

In 2012, Krueger and Kayleigh moved to a new apartment in the same complex where she and Jason had lived. The apartment measured 585 square feet, and had two bedrooms, one for Krueger and one for Kayleigh. At some point Jason moved back in with them, but Jason and Krueger broke up, and in June 2013 Krueger called the police because Jason was stalking and harassing her. Jason was eventually arrested and sentenced to prison for violating parole.

Krueger and Warner had reconnected on Facebook in the summer of 2011. She and Jason were sometimes seeing each other and sometimes not; she would text with Warner when she and Jason were "off," but not when she and Jason were back together.

Friends, family members, and neighbors testified that for the first three years of Kayleigh's life, she was a happy and healthy child, and

---

[6] We use first names to refer to individuals who share the last name "Slusher."

Krueger was attentive to her. Krueger took her to the doctor regularly and facilitated her relationships with members of Jason's family, as well as her own.

3. *Summer 2013: Warner Moves in with Krueger and Kayleigh*

In the summer of 2013, Justin Kent stayed in Krueger's apartment a few nights a week. He testified that initially Krueger was attentive to Kayleigh and there was no drug use in the apartment. But about a month after Kent started staying with Krueger, Warner moved in and things began to change. Soon Warner, Kent and Krueger were using methamphetamine and marijuana in Krueger's bedroom while Kayleigh watched TV or played in another room. Warner and Krueger were in a romantic relationship, and Kent believed that Krueger had more affection for Warner than he had for her—Warner did not label them as a couple. Kent moved out after a disagreement with Warner.

4. *Fall 2013 through January 2014: Changes in Krueger and Kayleigh*

Robin Slusher, Kayleigh's paternal grandmother, testified that she was very much involved in Kayleigh's life until about Halloween of 2013, when a new pattern developed: Robin would ask to see Kayleigh and Krueger would not allow it saying that Kayleigh was sick, or Krueger would cancel a planned get-together, saying Kayleigh was sick. Robin attempted to see Kayleigh at Thanksgiving, but Krueger told her Kayleigh was sick.

In mid-December 2013, Krueger told Robin that Kayleigh was sick and asked Robin to bring Pedialyte and popsicles to the apartment, which Robin did, but Krueger did not permit Robin to enter the apartment or see Kayleigh. Robin saw Kayleigh at Robin's house for about 45 minutes on Christmas day, and noticed that she had dark circles under her eyes.

6

In mid-January 2014, Robin took Krueger and Kayleigh to a movie.[7] Robin noticed that Kayleigh had a bruise that covered almost her entire cheek. Krueger told her that Kayleigh had bumped heads with Krueger's friend, and that although the friend had been crying, Kayleigh said, "Don't cry. It's not a big deal." After the movie, Kayleigh "burst into tears" because she didn't want the movie to be over. When they got in the car for Robin to drive them home, Kayleigh said she wanted to go to her grandparents' house, and she cried when Krueger said no.

During the third week of January, Krueger told Robin that Kayleigh was sick, and Robin went to the apartment with food to settle Kayleigh's stomach. Once again, Krueger did not allow Robin to enter the apartment or see Kayleigh. On January 29, Robin asked the police to conduct a welfare check on Kayleigh. On January 31, Robin texted Krueger and asked if Kayleigh could join her for a family lunch. Krueger responded by text that they were going to Santa Cruz for the weekend.

Jennifer Slusher, Kayleigh's aunt, testified that she had spent a great deal of time with Robin, Kayleigh, and her own children from the time Kayleigh was born until about three months before her death. During that three-month period Jennifer tried several times to arrange for Kayleigh to get together with her children, but Krueger would not allow Kayleigh to visit.

Sophia Grech, Krueger's sister, often visited the apartment that Krueger shared with Kayleigh. She testified that Krueger had been "an amazing mother," who "would play with [Kayleigh] and make sure she was taken care of." But things changed after Warner started living there. Krueger seemed unhappy. Once, Krueger's finger or hand was broken, and

---

[7] In the remainder of this opinion, dates are in 2014 unless otherwise stated.

7

Krueger told her she had slammed it in a door. It began to seem to Grech that Krueger was paying attention to Warner, but not to Kayleigh, who would be in a different room of the house. Weeks before Kayleigh's death, Krueger admitted to Grech that she was using methamphetamine.

Around Christmas 2013, Grech noticed a bruise about 3 inches in diameter on Kayleigh's lower back. When she asked Krueger about it, Krueger said that Warner had told her that they were playing with Kayleigh's bike and that she fell. About a month before Kayleigh died, Kayleigh became quieter. And in that month, Grech spent less time at the apartment, but about two or three weeks before Kayleigh died, Grech walked into Krueger's bedroom and saw her using methamphetamine. The last time Grech saw Kayleigh was about a week before Kayleigh died; Kayleigh was coloring at the kitchen table with no one else in the room. Grech tried to call Krueger several times in December 2013 and January 2014, but failed to reach her: when Grech called, Warner would answer the phone and hang up on her when she said "hello."

Krueger's friend Amanda Patterson would get together daily with Krueger and Kayleigh. Before Warner came to live with Krueger, neither Krueger nor Patterson was using drugs, though they had used them in the past. After Warner moved in with Krueger, the women went back to using drugs, sometimes with Warner and sometimes without him. At first, they used methamphetamine just on the weekend, but then on an almost daily basis. Patterson told an investigator that when Krueger came down from methamphetamine she would get irritable, upset, or angry.

Patterson testified that after Warner moved in, Krueger "stepped back as a mom" and let Warner do "fatherly things," including taking Kayleigh to the bathroom, making meals for her, and feeding her. One time when

8

Patterson and Krueger were present, Kayleigh was sitting in her highchair, said she was full, and then threw up. Warner responded by telling Kayleigh she needed to stay in the chair until she was done eating. Warner would discipline Kayleigh by lecturing her and putting her in time outs that lasted from a couple of minutes to 20 or 30 minutes.

Patterson observed that after Warner moved in, Kayleigh cried more, became scared to go to the bathroom, and started having a hard time moving her bowels.[8] A few weeks before Kayleigh died, Patterson noticed bruises on Kayleigh, including a bruise on her chin and neck. Warner told her that Kayleigh fell and hit her chin in the bathtub; Krueger told her that Kayleigh had tripped over the clothes hamper in the bathroom. Starting about a month before Kayleigh died, Patterson noticed that Kayleigh was often sick and throwing up, and looked tired.

Krueger described her relationship with Warner to Patterson as complicated, as though "they were together but not together," even though Krueger cared for Warner. Patterson thought Krueger might have been infatuated with Warner, but based on his behavior, she did not think he was infatuated with Krueger. Patterson was not aware of Warner ever hitting Krueger but observed him verbally abusing her. Patterson characterized Warner's behavior as "controlling." Warner frightened Patterson once when he and Kent woke her in the middle of the night, with Warner sitting on the end of her bed saying he could tell her things that would scare her.

---

[8] Kent had testified that when he started staying at the apartment, Krueger was toilet training Kayleigh. The training was going well when Warner first arrived, but Warner made her sit on the toilet until she relieved herself, sometimes as long as half an hour. Sometimes Kayleigh asked for her mother; even though Krueger was present, Warner would go into the bathroom and tell Kayleigh she had to use the toilet before she could get up.

Several of Krueger's neighbors in the apartment complex testified that after Warner moved into Krueger's apartment, they saw Kayleigh playing outside less often than they had before; when they did see her, she was often alone, while in the past Krueger had been with her. Neighbors also testified that Kayleigh had bruises in the last months of her life, and that she looked pale, acted subdued, and had a black eye in the weeks before her body was found.

Neighbors offered other testimony as well. Breann Abernathy, a medical assistant who lived in the apartment next to Krueger's at the time of Kayleigh's death, testified that after Warner moved in with Krueger, she heard yelling, arguments, and screaming from Krueger's apartment. Abernathy also recalled Krueger going to the doctor for whom Abernathy worked to get treatment for a hand injury, and telling Abernathy that she hurt her hand when she and Warner were moving furniture at 3:00 in the morning and her hand was slammed against the wall. One night about a week before Kayleigh died, Abernathy was awakened by what she thought was something being thrown against the wall in Krueger's apartment.

Mandi Farr testified that at about 3:30 one morning, Farr and her boyfriend were awakened by Krueger and Warner knocking on the door, asking the boyfriend to drive Krueger to the emergency room and Farr to watch Kayleigh. Krueger appeared to be in pain; she said her fingers had been slammed in a door. Farr understood that Krueger and Warner were in an argument and Warner slammed her hand in the door. When Warner later came to pick Kayleigh up, Kayleigh held on to Farr's neck, saying "no, no, no, no." When Kayleigh realized that Krueger was there with Warner, she let Warner pick her up and they left.

Alejandra Fermin Cisneros lived in an apartment next door to Krueger's; the apartments shared common bedroom walls, and Kayleigh's bedroom shared a wall with Fermin Cisneros's. When Krueger and Kayleigh first moved in, Fermin Cisneros would hear them laughing and playing in Kayleigh's bedroom. After Warner moved in, she no longer heard laughter and playing through the wall. About three times in the two weeks before Kayleigh's death, Fermin Cisneros was awakened in the middle of the night by the slamming of a door in Krueger's apartment. She testified that after she heard the door slam, she would hear Krueger or Warner screaming at Kayleigh to be quiet. She "would hear [Krueger] hitting her and then coming out—getting outside of the room, because you can clearly hear that they would slam the doors. And after that, [Warner] I believe would come in and he would say, 'Didn't you hear your mom to tell you to be quiet,' or 'shut up.' I can't remember exactly what word he used. And—well, that's what I would hear, that they would hit her, yes." She did not recall each occasion in detail, but she recalled that one night Krueger yelled at Kayleigh to be quiet or she would hit her, she heard Krueger hitting Kayleigh, and she heard Warner yelling at Kayleigh. After Krueger and Warner left the room, she would hear Kayleigh breathing heavily. On two of the occasions, Fermin Cisneros knocked on the wall and said Kayleigh's name. She thought Kayleigh knocked back the first time.

5. *Police Visits to Krueger's Apartment in Late January*

On January 27 at about 9:40 a.m., Officer Chambers responded to a report of a loud disturbance in Krueger's apartment. Krueger answered the door, upset and crying; before Chambers could explain why he was there, she asked whether it was illegal to argue. Chambers explained that someone had reported a loud argument in her apartment and he wanted to make sure

11

everyone was okay. Chambers was inside the apartment for about five minutes, and while he was there, he saw Kayleigh, who sat on Krueger's lap. Chambers observed Kayleigh to seem happy, and she asked him about his uniform. Krueger said she and Warner had been arguing over money and that she had slammed a door a couple of times. She said she did not need police assistance, and Chambers did not notice signs of domestic violence. Warner was in the apartment when Chambers arrived; while Chambers was talking with Krueger, Warner was outside talking with an officer who had accompanied Chambers.

On January 29, at about 8:30 p.m., Napa Police Officer Garrett Wade went to Krueger's apartment to conduct a welfare check for Kayleigh that had been requested by Robin, Kayleigh's grandmother, who had expressed concern that Kayleigh wasn't being adequately fed and that Krueger was using drugs. When Krueger answered the door, Wade explained he was there for a welfare check and asked to come in. Krueger initially said no and closed the door so that just her head and upper body were outside the door. Wade then asked Krueger to call Kayleigh to the door, which Krueger did. Krueger lifted Kayleigh, who was wearing pajamas, to her hip and stepped outside the door; the only part of Kayleigh's body that Wade could see was her face. He noticed two small bruises on the left side of Kayleigh's chin and asked Krueger about them. She said Kayleigh had fallen off her bike. While Wade was talking with Krueger he saw Allen Epperson, whom he knew, and Warner walk from the back of the apartment. Wade eventually walked through the apartment, scanning it as he went, and did not observe any drugs or contraband or anything that seemed to pose an immediate danger to a child. He saw food on the counter in the kitchen, which appeared moderately clean.

12

Wade then spent about 15 minutes with Krueger and Warner, evaluating them for signs of intoxication and interviewing them as they sat on the living room couch a couple of feet apart from each other. Krueger did not appear to be intoxicated. Warner, who showed some signs of intoxication, admitted that he had taken one of Krueger's pain pills and smoked marijuana.[9] Warner identified himself to Wade as "Ryan Howard"; Krueger said nothing about his true name. After about 10 minutes focusing on Warner, Wade turned his attention to Krueger. Kayleigh said nothing to Wade during the visit; he thought she said something to Krueger, but he could not hear what it was. A few minutes later, Kayleigh, who was still in Krueger's arms, vomited. Krueger stood up to leave the room, saying she was going to take care of Kayleigh because she had the flu, and asked Wade to leave, which he did.

6. *Epperson's Testimony*

Epperson had known Krueger for about 10 years. They would use methamphetamine and marijuana together until Krueger got pregnant, at which point she stopped using except for occasionally smoking marijuana. Epperson regarded Krueger as a sister and Kayleigh as his niece. He had been in and out of jail for the past several years and would spend time with Krueger when he was out.

Epperson first met Warner when he went to Krueger's apartment on January 9 or 10; he hadn't seen Krueger in about a year before that. He testified the apartment seemed messed up and dirty, and recalled that he had told the police he had never seen Kayleigh looking so pale and not well taken

---

[9] Krueger testified that she had constant pain in her hand for which she had been prescribed Percocet and Tramadol, which she took "occasionally."

care of, and that Kayleigh told him, "I'm so happy to see you. I don't like nobody in this house here no more." Krueger and Warner looked "strung out, like they'd been using," and Krueger was acting "on edge, moody" as if she was high. She had lost weight since he saw her last.

Epperson next went to Krueger's apartment on January 29, the day of the police welfare check. He recalled that he had told the police that Kayleigh "looked like shit" that day. When he asked about Kayleigh's bruise, Krueger said Kayleigh had fallen down and bumped her head. At some point he went to the refrigerator to get something to eat, but it seemed empty.

On January 29, Epperson, Krueger and Warner smoked methamphetamine in the bedroom with the door closed while Kayleigh was in the living room watching cartoons. Before the police came, Krueger had gone to check on Kayleigh, and found her in the bathroom drinking something that might have had tobacco in it. Krueger started yelling, asking Warner where her cell phone was so she could call poison control, and then went into the kitchen slamming things. When Epperson went out into the living room, Krueger was trying to get Kayleigh to drink water and throw up; Krueger said that poison control told her to do that. Epperson was under the impression she had called poison control.

Epperson left the apartment after the police welfare check that evening. At some point before he left, Krueger gave him a Percocet. The next day, January 30, at about 1:50 p.m. he texted Krueger asking for more Percocet but got no response. He texted her again on January 31 at about 10:30 a.m. and got a response saying, "Hey, my bad, we bounced out of town for a min. After what happened the other night we just had to get away."

During one of Epperson's January 2014 visits to the apartment, Warner admitted that he was with Krueger just to get a place to live.

14

7.    *Flight and Arrest*

Sometime after 9:00 a.m. on February 1, a neighbor saw Krueger and Warner leaving Krueger's apartment with luggage.[10]

Around noon that day, Antonio Vasquez was at a Home Depot waiting for work and noticed Krueger asking for a ride. Warner was with her, but about 20 feet away. Krueger, who did not seem upset, asked Vasquez for a ride to the bus station in Vallejo, telling him that she had a children's video game she would give him in exchange for the ride. He agreed to give her a ride, and she called to Warner. They had a suitcase-like bag with them. The drive took 20-25 minutes, during which no one spoke. Neither Krueger nor Warner appeared to be upset.

On the morning of February 2, Silvia Melendez was sitting in the lobby of a restaurant when she looked at a news story on her cell phone about the police looking for two suspects in connection with the death of a little girl. The story included pictures of Krueger and Warner. A woman and man then entered the restaurant. Melendez noticed that the man looked like the person in the photo, and started looking at the story again, at which point she saw that the woman, who had sat down next to her, was looking down at Melendez's cell phone. The woman then got up quickly and spoke with the man, and the two left immediately.

Later that morning, BART Police Officer Boutain received an alert describing two people who were wanted for murder by the Napa police department and who were last seen at a restaurant across from the station where Boutain was located. Boutain canvassed the BART station, saw Krueger and Warner, and asked if they needed help. Krueger started crying

_____

[10] Warner was carrying a red and black "hand pack." The bag was never found.

and said she needed to talk to the Napa police about something bad that had happened there. Krueger and Warner were then arrested.

Napa Police Officer Piersig went to El Cerrito to assist in bringing Krueger and Warner from El Cerrito to Napa. He drove back to Napa with Warner in the back seat. He testified that Warner was calm, and said that he had been trying to figure out a way to contact the police. During the drive, Warner was quiet and looked straight ahead, except that when Warner saw an older car with a nice paint job he "perked up" and commented on how cool the car was.

Warner had his cell phone in his pocket when he was arrested. In the phone case there was a receipt from Target for the purchase of ice cream on January 31 at about 3:15 p.m. Krueger's cell phone was in her purse, as were state benefits cards for Krueger and Kayleigh

Blood drawn from Krueger and Warner on the afternoon of February 2 tested negative for the presence of methamphetamine and positive for marijuana. A toxicologist testified that methamphetamine is on average undetectable three to four days after ingestion.

8.      *Warner's Interview with Detective Hess*

Andrew Hess, the lead detective on the investigation of Kayleigh's death, interviewed Warner on February 2, after he was arrested and taken back to Napa. Jurors watched a videotape of the interview and were given transcripts to follow along.

Warner said that although he and Krueger were living together and had a relationship, they never labeled themselves boyfriend and girlfriend. He and Kayleigh were close: she liked him and he loved her. He had more patience with her than Krueger did and took care of her quite a bit, probably more than Krueger did. He often babysat for Kayleigh; he treated her as his

16

daughter, and she viewed him like a father.  He said he loved Kayleigh and said she was "really smart, she listens well, she's a good child."

On January 29, sometime between 4:00 and 7:00 p.m., he found Kayleigh hunched over in the bathroom, and asked her what had happened. She said she had thrown up.  She was holding a measuring cup that Warner had used to clean out a tobacco pipe with water and Windex cleaner.  Warner asked Kayleigh if she had used the cup; she replied, "I wanted water," and said she had used the cup.  Warner told Krueger, who was in the apartment along with Epperson.[11]  Warner explained that once he realized that there was a possibility that she had drunk the liquid that was in the cup, he asked her if she had drunk from it, and she said yes.  He then asked her, "Did you drink the . . . water that was in there, or did you get new water?" because he "wanted to get a real answer out of her," and he knew that because she was "a little child," if he said, "Did you dump this stuff out first and then get it?" she was likely to just agree with what he said.  Kayleigh told him she had drunk from the cup but had gotten "new water."

Warner and Krueger tried to get her to drink water and keep throwing up.  At some point Krueger asked if they should call poison control.  Warner said he deferred to Krueger as Kayleigh's parent, and Krueger decided they should continue giving Kayleigh water and help her throw up.  Warner also said that he was thinking that maybe they should call for help but said that he was scared that if they called someone, they would get in trouble for using drugs.  Warner stuck his finger down Kayleigh's throat to induce vomiting.

---

[11] Krueger told police that she had put the measuring cup on the stove. The parties stipulated that a measuring cup found in the kitchen of Krueger's apartment bore Warner's fingerprint, and DNA consistent with Kayleigh and Warner.

After about half an hour, Kayleigh said she felt better, and Warner and Krueger tried to get her to eat popsicles with electrolytes. At this point, Krueger took over. Warner was in the other room with Epperson and heard her "going fucking crazy" on Kayleigh and yelling at her to eat the popsicles. Warner said he stepped in and told Krueger she had to stop. Kayleigh went to bed, but kept getting out of bed.

At about 9:00 or 10:00 p.m. that night the police came to do a welfare check. After the police left he went to check on Krueger and Kayleigh. They were in the shower, and Krueger was upset, saying her daughter had almost been taken away from her.

Kayleigh kept on getting up from about midnight until 3:00 or 4:00 in the morning, saying she had to throw up or asking for water. Krueger got up with her, but Kayleigh didn't throw up, and eventually Warner thought she needed to defecate, and asked to take over. Krueger agreed. Warner explained to Hess he had helped toilet train Kayleigh, specifically with regard to defecation. He said she would "hold it in for . . . days" and then have very large bowel movements, which he thought must hurt her. So Warner took Kayleigh to the bathroom, and helped coach her through a bowel movement; at some point she said "okay I can feel it, it's about to come out," and he gave her a hug and kiss, and said he was proud of her and said she should let him know when she was done. She said okay, and gave him a thumbs up, and he left the bathroom at about 4:00 a.m. on Thursday, went to bed, and fell asleep.

He was awakened on Thursday afternoon by Krueger commenting that they had slept until 4:00. Warner told Hess that the reason they had slept so long was because they had been up for a couple of days beforehand. Krueger went to check on Kayleigh and came back asking why her daughter was

sleeping on the bathroom floor.  She checked again and said, "Oh my god, Ryan, she's dead," at which point Warner got up and found Krueger holding Kayleigh.  He told Krueger to give Kayleigh to him; he listened to Kayleigh's heart and grabbed her fingers, and realized she was dead.

Krueger said they needed to call the police and told him that he should leave, and she would handle it.  Krueger was upset, saying that they should have called poison control.  Warner told Krueger they needed to be calm, and then he put Kayleigh, who was naked, because she had removed her one-piece pajamas, to bed.  He was scared that they would get in trouble for using drugs and for not taking action when Kayleigh drank the contaminated water.

Krueger said that they should leave and start a new life somewhere else, and that no one needed to know about this.  Warner "just wanted to get the fuck outa there," and texted his friend Antonio Valdez to figure out what to do.  That night, he and Krueger slept, but he kept waking up throughout the night.

On Friday morning, January 31, Warner and Krueger awoke and decided to get away.  They put Kayleigh's body in a bag, and put the bag inside a suitcase the size of a duffle bag, which they put in Kayleigh's bedroom.  Warner said the body "was in that thing . . . for quite some time."  At some point after that, Krueger said she needed to get out of the house, so they went for a walk to get some air and ended up getting some ice cream and coming back.  Kayleigh's body was still in the suitcase in her bedroom.  Krueger wanted to leave and let the police eventually find the body.  Warner told her that if they were going to leave, he wanted to put Kayleigh in the refrigerator or freezer so that when the body was found an autopsy could be

done and people would know what happened.  Krueger agreed, and late that night they put Kayleigh, still in the suitcase, in the freezer.

A little later in the interview, Warner told a different version of what happened:  he said that Valdez came over with his brother late on Friday or early Saturday.  The brother came into the house, and Warner showed him the body, which had not yet been put into the bag and the freezer; it went into the freezer after that.  Valdez and his brother got angry and abandoned the situation.  So at about midnight on Friday or 1:00 a.m. on Saturday, he and Krueger put Kayleigh in the freezer.  Warner estimated the body was in the freezer for about six hours, and the next morning Krueger took Kayleigh out of the freezer and put her in bed, covered her, read her a book and gave her some toys.

Then it was time to go, and Krueger and Warner packed up some things, including Warner's PlayStation, and they went to Game Stop to try to sell it.  Game Stop would not take it, so they walked to Home Depot and traded the games for a ride to the bus station in Vallejo, and then took the bus to BART, and BART to San Francisco, planning to wait until some money arrived for Krueger, at which point they'd get on a bus and go far away.

Hess asked Warner why he didn't "stick around and deal with it," and Warner initially replied that he was "just . . . going with the flow," and that Krueger "seemed to have control of it.  The situation."  When Hess said, "So you're saying some of her ideas were like putting the child in the suitcase and those things," Warner responded, "No.  I mean it was basically kind of a mutual thing.  It was like she, she, she was—we both agreed that—."

When Warner took Kayleigh to the toilet on the morning she died, he noticed bruises on her back and down onto her bottom.  He later agreed that she had bruises all over, and remarked that she had all the bruises when the

20

police came to check on her Wednesday evening.  He also said that Kayleigh had bruises for a week before she died.  Asked what the bruises were from, he replied, "from getting spanked," and said that both he and Krueger would spank her.  Asked how spanking could cause bruises on the back, Warner said that Kayleigh said those bruises were from leaning back against the toilet and from crashing her bike.  Asked about the bruises near Kayleigh's eye seen a week or two before the death, Warner said that one time after Kayleigh went to the bathroom he said, "good job," she asked for hugs and kisses, and when he bent down she jumped up and slammed him in the face.  They both got bruised.

Warner said he and Krueger had verbal arguments, but the only violence had occurred when he once punched a door "because [Krueger] was flipping out, going crazy."  Also, once she was coming in the door, it slammed his toe, and he pushed it back, slamming Krueger's hand.  That was about the same time that he and Kayleigh got bruised faces.  Warner said he had spanked Kayleigh four or five times in the six months he had lived with her and her mother; apart from that he would discipline her by having her stand in the corner for 20 to 30 minutes.  He said he never beat her, and he could not explain all the bruises on her body.  Warner said he had seen Krueger spank Kayleigh, but never beat or punch her or anything like that.

Toward the end of the interview, Hess observed that Warner was "showing absolutely no emotion."  Warner responded, "this whole entire situation has me in a state of . . . mind that emotions are . . . all over the place.  And just because I'm not sitting there crying and freakin' out like that doesn't mean I'm not emotionally involved, okay."  At trial, Hess described Warner's demeanor during the interview as sometimes calm and sometimes talking quickly.  Hess stated that Warner showed little or no emotion for

21

most of the interview and never said he was sorry about what had happened to Kayleigh.

        9.     *Krueger's Interview with Detective Hess*

Detective Hess also interviewed Krueger on February 2. The interview was in two parts; as part of the cross-examination of Krueger, who testified in her own defense, the jury was shown videotapes of both parts, and given transcripts to follow along. We summarize the interview here.

The interview began with Hess asking Krueger what had happened to Kayleigh. Krueger said that on the night of January 29, Kayleigh started vomiting after she drank from a measuring cup. The cup had contained two squirts of Windex and dirty water that Warner said he had used to clean a tobacco pipe; Krueger could see tobacco in the sink, and Kayleigh told Krueger she poured out what was in the cup and then filled it up with water because she was thirsty. At the time, Krueger, Warner, and Epperson were at the apartment. Krueger thought Kayleigh had swallowed tobacco, which made her sick. Kayleigh vomited quite a few times, over a period of hours.

Asked why she didn't call the paramedics when Kayleigh was vomiting, Krueger said that it was because she and Warner had been using drugs. At the time Kayleigh drank the liquid, Krueger was "coming back" to her senses after using methamphetamine, and wanted to call poison control, but Warner told her that Kayleigh was throwing up, which is what she needed to do. They thought she had thrown up whatever she had drunk.

When Kayleigh stopped throwing up, she was put to bed, and Krueger went to bed as well. When Krueger awoke, on the afternoon of Thursday January 30, she found Kayleigh on the bathroom floor and thought she was sleeping. Kayleigh had apparently taken off her zip-up pajamas, which she could do by herself. Krueger went to wake her up, but Kayleigh was stiff.

Krueger told Hess she wanted to call the police when she found Kayleigh's body, but Warner said the police wouldn't believe them. So Krueger told Warner to leave, and that she would call the police. Even though she had a phone and could have called, she didn't because she was scared. Krueger said that after she found Kayleigh, she held her and then put her in her bed wrapped in blankets.

For the rest of Thursday afternoon and Friday, she would go in and out of Kayleigh's room. Warner said he didn't want to go to jail for something he didn't do, and Krueger told him to leave and run so she could call the police. Warner spent time on Friday making phone calls.

On Friday night, two people came to the house, including one of Warner's friends, who Krueger knew to be a high-ranking gang member and who terrified her, and the friend's brother. Warner had asked them to get Warner and Krueger out of there. Warner and Krueger told the men what happened, and the friend said they should have called the police. Warner took the men into Kayleigh's room, while Krueger remained in the kitchen. The men told Warner and Krueger to call the police, which they did not do.

At about 1:00 or 2:00 on Saturday morning, after the men left, Krueger said she was going to call the police, and Warner put Kayleigh's body in the freezer to preserve evidence. Krueger said she may have passed out, and that Kayleigh's body was in the freezer for about three hours before she took it out and put it back in bed with blankets, a pillow and a toy.

Krueger and Warner then fell asleep for a couple of hours, and when they awoke they decided they had to leave. At about 9:00 or 10:00 a.m. on Saturday, they left the apartment and walked to a nearby Game Stop, where they tried to sell a PlayStation 3. Later they sold it to someone at Home Depot to get a ride to Vallejo, where they got on a bus, which they took to a

23

BART station.  They then went to San Francisco and walked around, and they went to a church to pray and have the pastor help them call the police, but the church was closed, so they went to the airport, where they stayed the night.  On Sunday morning, they took BART back to the station where they had boarded, and went to a restaurant because Warner was hungry.  She turned her phone on just one time.

Krueger told Hess she hadn't used drugs in days, except for some marijuana.  She said she'd had a problem with methamphetamine long before she had Kayleigh, but she stopped using when she learned she was pregnant and didn't use again until Warner came into her life in 2013, at which point they were using almost every day or every other day.  Kayleigh would watch a movie when they used.

When asked about bruising on Kayleigh that neighbors had noted about a week before, Krueger said Kayleigh had fallen off her bike, and had just a little bruise.  Krueger also said that at one point Kayleigh had a black eye; Warner told her that he and Kayleigh had bumped heads when Kayleigh jumped up to give him a hug, resulting in a black eye for Kayleigh and a swollen eyebrow for him.  Krueger was not present when it happened but had no reason not to believe it.  Also, Kayleigh had the flu about two weeks before she died.

Krueger said she and Warner had been together since August and although her own relationship with Warner was "complicated," he was good to Kayleigh, and the two of them were close.  He helped with Kayleigh's toilet training, and taught her letters and numbers.  Kayleigh was smart, friendly and outgoing, and used to ask Krueger if Warner could be her dad.  In response to Hess's remark that people told him Kayleigh's demeanor had changed since Warner was around, Krueger told Hess that Kayleigh missed

24

her father and was often nervous but perked up around Warner. Krueger said she never saw Warner put his hands on Kayleigh, and Kayleigh never said anything to Krueger about Warner doing anything to her.

In the second part of the interview, Hess asked who had given Kayleigh baths, and whether Krueger had noticed bruises when she bathed her. Krueger said that both she and Warner had given Kayleigh baths. Kayleigh bruised easily, and she sometimes noticed bruises, mostly on Kayleigh's knees or elbows. Krueger said that sometimes Warner would be alone with Kayleigh, for example when she went to the store.

Asked how they put Kayleigh in the freezer, Krueger answered that Warner folded her legs, put her in a plastic garbage bag and then a suitcase, and put the suitcase in the freezer, which had no food in it.

Krueger said she promised the men who came to the apartment early Saturday morning that she would call the police, but she didn't. Krueger said she was afraid to call the police because Warner told her that if he went to jail, the men would come for her. She also said that Warner had her phone most of the time, but she turned on her phone once and saw that she had a lot of text messages and knew that the police would be coming.

Krueger said that when Warner got angry, he would yell a lot, but generally not get physical, except that once he got angry and slammed a door on her hand; she didn't know if he had done it on purpose. When Warner was on methamphetamine, he would be up for days and his temper would be much shorter.

As far as Krueger knew, Warner was good to Kayleigh. He spanked Kayleigh with an open hand a couple of times on her bottom; Krueger told him not to do that anymore and Warner said he wouldn't. During the last couple of weeks of Kayleigh's life, Kayleigh and Warner got along very well

together—she would sit on the couch with him and hug him. Sometimes he would get angry with Kayleigh because he thought "she was holding in her poop." At first Krueger thought it was strange that he would take Kayleigh to the bathroom, but she was okay with it because she would hear Kayleigh tell Warner that she loved him and say that she wished he was her dad.

Hess left the room for a time; when he returned, he said he had been talking with Warner and had some more questions for her. He asked about Krueger trying to give Kayleigh popsicles after she was sick to make her better. He asked if she had hit her, and Krueger said she had raised her voice at Kayleigh to get her to eat them but did not touch her. She said she spanked Kayleigh in the past, a long time ago, but apart from that never put her hand on her.

He asked about going out for ice cream. Krueger said that Warner wanted to get ice cream, but she couldn't eat it; Warner ate most of it. They also got cigarettes and she smoked to calm her nerves.

When she found Kayleigh dead, she saw bruising on her buttocks or "red butt" from Warner spanking her. She also saw bruises on Kayleigh's back that Warner said were "from the red butt." She said she saw only a few tiny bruises, and she didn't see any on Kayleigh's stomach. When she saw Kayleigh dead, her first thought was that "she didn't pour out the water," that she "drank that stuff and we poisoned her."

10.    *Medical Experts*

Two medical experts testified for the prosecution, forensic pathologist Dr. Joseph Cohen, who performed the autopsy on Kayleigh on February 3, and Dr. James Crawford-Jakubiak, a child abuse pediatrician, who had reviewed Kayleigh's medical records as well as documents, photographs and x-rays from the autopsy.

Kayleigh was 41 inches tall and weighed 34 pounds. Dr. Cohen identified 41 external injuries on the body, which appeared to have been made within hours to two or three days before death.[12] There were numerous blunt force injuries to the front and back of the torso, reflected in small and large bruises, mostly on the abdomen, but also on the back and buttocks. Dr. Cohen counted 8 to 15 individual bruises to the abdomen, indicating 8 to 15 individual impacts. There were also external injuries to the extremities, i.e., the arms, forearms, thighs, legs and knees, as well as injuries to her head, which were reflected in bruises on her forehead, cheek and under her chin, and internal injuries to her scalp, one corresponding to the bruise on her forehead, and one on her temple.

Dr. Cohen testified that moderate force would have been required to inflict the injury to the head that resulted in interior bruising, and that "moderate to severe" force would have been required to inflict the other external injuries that he observed. None of the injuries to the abdomen would have resulted from a spanking. Nor were the injuries to the buttocks, back, or thighs caused by a "typical" spanking. Dr. Crawford-Jakubiak opined that the extent of injuries on Kayleigh's body was far beyond what would commonly be suffered by a three-and-a-half-year-old in the course of her life, and were caused by repeated episodes of major blunt force trauma. The injuries were consistent with beating, not with spanking or falling from a bike.

---

[12] Some of Kayleigh's injuries, including a healed broken rib, occurred a few weeks before death. Dr. Crawford-Jakubiak testified that the broken rib would have caused Kayleigh pain, including when she moved, and that given her age, Kayleigh would have communicated the nature of the injury.

Dr. Cohen noted that the skin over the entire abdomen was green, a sign of infection. When he opened the abdominal cavity, about two cups of liquid poured out, consisting of blood and intestinal contents. The source of the liquid was a rupture in the wall of the small intestine in the middle of a 12-inch segment of the intestine that was necrotic (i.e., dead or dying). In addition to the injury to the intestine, Dr. Cohen observed blunt force injury to the mesentery, which is the tissue that holds the intestine in place and is anchored near the spine. Dr. Cohen also found a small recent injury to the front of the spine. He found no evidence of constipation, abdominal disease, or a spontaneous rupture.

The cause of death was abdominal trauma, which caused a lack of blood flow in the belly, as well as damage to the intestine. As a result of the trauma and lack of blood flow, the intestinal tissue became necrotic. The intestine perforated and its contents spilled into the belly, ultimately resulting in shock and death. Dr. Cohen stated that Kayleigh had been abused and neglected. As to neglect, he opined that "it would have been very clear that Kayleigh was in harm's way after receiving the lethal injury, that the lethal injury if treated early would have resulted in survival through surgical excision of that dead portion of small intestine." Neglect was also reflected in Kayleigh being dehydrated and slightly malnourished. Dr. Crawford-Jakubiak noted that from just after her birth until just after her third birthday, Kayleigh went to the doctor frequently and Krueger often called the nurses for small problems. On a couple of occasions, Krueger sought care for Kayleigh when Kayleigh was vomiting. Kayleigh's history of medical care abruptly stopped in June 2013.

Dr. Cohen testified that after suffering a blow to the abdomen that resulted in the injuries he observed in Kayleigh, a child would have cried and

would have suffered discomfort, pain, nausea, vomiting, and loss of appetite. The symptoms would have progressed over time to unconsciousness and death. Dr. Crawford-Jakubiak testified that the fatal injury to her abdomen would have been very painful and Kayleigh would have cried, probably vomited, and expressed what happened in words. As the injury progressed and the bowel died, Kayleigh would have vomited, could have passed blood from her anus, and would have experienced great pain for an extended period of time until she lost consciousness.

Dr. Cohen testified that a "substantial" amount of force would have been required to injure her spine, and a "severe" amount of force would have been required for the fatal injury, and in each case the force came from blows to the front of the body. He could not be certain how many impacts caused the injuries; it could have been one or two or more.

Neither Dr. Cohen nor Dr. Crawford-Jakubiak could determine exactly when Kayleigh died. Dr. Cohen testified that based on the state of the body's reactions to the injuries and the fact that the reactions stop at the time of death, he estimated that the fatal injury to the intestine and mesentery was inflicted more than 12 hours before Kayleigh died, and probably 18 to 24 hours up to two or three days. From the necrosis of the bowel and the amount of fluid in the abdomen, Dr. Crawford-Jakubiak concluded that the fatal injury occurred at least a day before Kayleigh died, and possibly longer. The experts agreed that, based on the descriptions of Kayleigh's behavior during the January 27 police visit, when she was active and engaging with people in her environment, and the January 29 visit, when she was quiet and during which she vomited, that the fatal injury occurred between the two visits.

Dr. Cohen noted that an "atypical" lividity pattern on the body indicated that it had been moved after death.

11.    *Police Investigation*

Investigators obtained, and played for the jury, video footage from Target corresponding to the day and time shown on the receipt found with Warner's cell phone.  Detective Hess noted that the footage shows Krueger and Warner buying ice cream on January 31 at about 3:00 p.m. and that the container was consistent with one found in Krueger's apartment.  He noted that Krueger was ahead of Warner when they entered and left the store.

Video surveillance footage from the San Francisco International Airport (SFO), also played for the jury, showed Krueger and Warner on an airport tram at about 11:15 p.m. on February 1.  Detective Hess testified that Warner and Krueger appeared to be having a good time in the video; they were talking, giggling, and snuggling together.  Hess noted that neither of them appeared to be upset or crying.

Krueger's medical records showed that she was treated for a hand injury on January 9 and told treating personnel that the injury was caused by her boyfriend, "Ryan Howard," who had accidentally slammed her hand in the door.  She was also seen for a hand injury on January 10 at a different facility, and she told the treatment team that a friend had accidentally slammed her hand in the door.

Kayleigh's medical records showed that Krueger had taken Kayleigh to the emergency room about seven times during the first three years of her life, including when Kayleigh had possibly ingested hand sanitizer.  Krueger had taken also Kayleigh to nine appointments and had two phone appointments.

An investigator who examined the computer found in Krueger's apartment testified that the web browsing history reflected a search for the

phrase "stabbing pain next to bellybutton," but not the date or time of the search.  He also determined that at about 11:00 p.m. on January 29, two video files were accessed or downloaded:  Terminator 2, Judgment Day and The Secret Life of Walter Mitty.

Another investigator testified that a review of web browsing on Krueger's phone during January showed a search on January 23, a week before Kayleigh's death, asking whether vitamin E is good for bruises, and at about the same time frame, searches on how to get rid of bruises now.  On January 24, there were continued searches on the same topics.  On January 25, there was a search for an article to the effect of a woman booked or jailed on suspicion of child abuse.  On January 31, after Kayleigh's death, there were searches for U.S. cities, including a search for U.S. cities with the highest population.

Investigators reviewed text messages on Krueger's phone between Krueger and Robin Slusher.  On December 17, 2013, Krueger asked Robin to bring ibuprofen for Kayleigh, as well as some food that would be easy on her stomach.  Krueger told Robin this was the sickest Kayleigh had been in a long time.  When Robin asked about Kayleigh the next day, Krueger said that Kayleigh had a fever of 100.4, down from 102.1.  Texting between the two on Kayleigh's condition continued through December 20, 2013, when Krueger reported that Kayleigh was still sick and had been throwing up all night.

In mid-January there was another series of text messages between Krueger and Robin.  On January 16, Krueger reported that Kayleigh had a fever and was throwing up.  Robin asked about Kayleigh the next day and was told Kayleigh had horrible diarrhea and a fever.  Robin checked in again on January 18 and 19; each time, she was told that Kayleigh was still sick.  Robin asked to see Kayleigh, but Krueger said no.

Robin contacted Krueger by text on January 25 and 26, wanting to see Kayleigh. Krueger did not respond until January 27, when she informed Robin that Kayleigh was very sick and she was waiting for a phone appointment with the doctor. When Robin checked in later to find out what the doctor had said, Krueger responded that the doctor said it was a nasty flu season and she should keep Kayleigh inside, give her fluids and monitor her for 48 hours.

During these periods there was no indication on the phone or in Kayleigh's medical records that Krueger had sought medical advice regarding Kayleigh.

The last text exchange with Robin was on January 31, when Robin asked to see Kayleigh and Krueger responded that they were going to Santa Cruz.

Investigators found that starting on January 30 at about 4:30 p.m. there were 76 outgoing phone calls from Krueger's cell phone to Valdez, as well as missed incoming calls from Epperson and Robin. There was an outgoing call on January 31 at about 3 p.m. to a number that allows recipients of welfare to check the status of their benefits. This call was made just before the purchase of ice cream at Target.

## C. Krueger's Defense

Warner did not testify or call any witnesses in his defense. Krueger, however, called fact witnesses, offered her own testimony, and called an expert witness, and Warner's jury was present for that testimony, as well as for the subsequent rebuttal evidence.

### 1. *Fact Witnesses*

Linda Reed testified that from April through June of 2013, Krueger occasionally worked as a substitute at Reed's daycare center, which Kayleigh

attended. Reed thought Krueger was a good mother, and asked her to work as a substitute based on seeing Krueger interact with Kayleigh.

Krueger's father, John Krueger (John), testified that when he saw Kayleigh on Christmas Day 2013 she was behaving normally, and that the last time he saw Kayleigh was about a week before she died. After that, at the end of January 2014, he tried to see Kayleigh, but was told by Krueger that Kayleigh was sick with the flu.

John testified that he and Krueger had a close relationship and used to talk on the phone every day. Their contact became less frequent after October 2013. By mid-January 2014, John was aware that Krueger was using drugs.

2. *Krueger's Testimony*

Krueger testified that she met Jason at a drug house when she was 16. At that time she had a "problem" with methamphetamine, and they used it together every day. Later, they used only on weekends. After about five months they became intimate, and when Krueger was 17 she moved in with Jason at his parents' home.

Jason was jealous, and he accused Krueger of cheating on him. The jealousy led to frequent arguments in which Jason became violent and struck her. He called her names, told her she was worthless, and harassed her when she went to see friends, so she stopped seeing many of them.

At 19, Krueger became pregnant, stopped using methamphetamine, and delivered Kayleigh in May 2010. Jason was in jail during part of the pregnancy, having been convicted of domestic violence for slamming Krueger's arm in a car door. On his release from jail, Jason continued using methamphetamine, and when he was coming off a high he was sometimes

33

violent. In June 2013 he was arrested and sent to prison after he threatened to kill Krueger and kidnap Kayleigh.

While Jason was in prison, Krueger reconnected with Warner, with whom she had been acquainted when she was 15. She invited him to visit, which he did in August 2013. At first Warner was going to stay for just a couple of days, but he ended up moving in with them. Krueger described Warner's relationship with Kayleigh as "[g]ood, like a stepdad." Like a good parent, he played with Kayleigh, helped with toilet training, and seemed very loving. Warner would have Kayleigh sit on the toilet for 15 or 20 minutes to have a bowel movement, and sometimes Krueger and Warner would argue because Krueger thought that was too long, but Warner told her that Kayleigh "was so backed up and constipated" and that "it was borderline child abuse to let her hold it in all day long" because she would be in so much pain when she finally moved her bowels, and Krueger thought it was better for Kayleigh to sit on the toilet than be in pain.

The first day Warner arrived, Krueger resumed her methamphetamine habit with him. They would smoke methamphetamine in Krueger's bedroom; Kayleigh would play in her bedroom or watch a movie. From the beginning of December 2013, Krueger was using methamphetamine every day. She would take a "hit" or two of methamphetamine for a "boost," five or six times a day, and used marijuana to ease the feelings of coming down from the high, sleeping every night or every other night. She agreed that she was high pretty much all the time from Thanksgiving through January.

Krueger initially testified that she would buy marijuana, but not methamphetamine. She said that Kent would come over and leave them some, or Warner would trade video games to a friend for drugs. Later, she testified that she would also go to friends' houses and use there and

34

sometimes they would give her some to take home.  Eventually, after reviewing texts she had sent and a transcript of a telephone call from jail, she admitted that she would spend money on marijuana, which she would trade for methamphetamine with her friends because they gave her a better deal, and that she had bought methamphetamine at least once.

In mid-December, Krueger learned that there was a warrant for Warner's arrest.  She was present on occasions when he lied to people about his name.  Because of the warrant, Warner rarely left the apartment, and Krueger was usually the one to run errands, and she would often leave Kayleigh with Warner.  Starting in mid or late December, she and Warner would often argue about her wanting to stop using drugs and having them around.

Krueger and Warner had verbal arguments almost daily from mid-December through January.  Krueger testified that the arguments would be about getting clean, and she denied that they concerned the relationship.  Although she wanted more from the relationship than Warner was willing to give, they argued about the relationship "maybe two times," the first of which was in November.  Around Christmas, they had their "first big fight" about getting clean, during which Warner threw the Christmas tree over.  On January 9, during another argument about getting clean, Warner slammed her hand in her bedroom door, injuring her badly.  She and Warner went to the hospital to have her hand treated, leaving Kayleigh with a neighbor.

On the morning of January 27, she and Warner got high.  Later, they had an argument:  she wanted to get clean, and he didn't, so she told him to move out.  Warner threw an abalone shell against the wall and pushed Krueger against her bedroom door and punched it right next to her face twice, leaving two holes in the door.  Warner told her that he would leave

35

only if she had the police remove him, and if she did that, he would have "Antonio [Valdez] and all his homies come handle [her]." Warner had told her that Valdez was a high-ranking gang member, and Krueger was afraid that if the police were involved, Antonio would come to the house and hurt her in front of Kayleigh. Krueger was also concerned that Kayleigh would be taken away because they were using drugs. The police arrived at the apartment in response to the argument, but Krueger did not tell them what Warner had said and done.

After the police left on the morning of January 27, Krueger took Kayleigh to a friend's house for several hours. She had told Warner to pack his things and leave while she was away. But while she was at her friend's house, she sent Warner a text message that said, "I really hope you're home when I get there." He responded, "I got up, made pancakes for your daughter, put cinnamon rolls in the oven . . . and you woke up treating me like dog shit for nothing," to which she replied, "I am so sorry. You do so much for us. I am so sorry. I guess I was just mad because I wanted to cuddle with you last night." She and Kayleigh went back to the apartment that afternoon, took a nap on the couch, and awoke to Warner saying that he would take Kayleigh to the bathroom and then make dinner.

That night, Krueger didn't really sleep. At about 10:00 a.m. on January 28, she was taking a shower and fainted; she hadn't eaten because she was using, and Warner told her to lie down, made her some soup, and said he would take care of Kayleigh.

For the rest of the day on January 28 Krueger slept off and on, until about 5:00 in the afternoon, when Kayleigh brought her a picture she had made for her. Krueger and Warner had an argument that evening, and at some point on January 28 she sent him a text saying that she cared for him,

and it was clear he would never have the same feelings for her, and she "just want[ed] to feel loved." After the argument, Krueger called her friend Epperson, crying and saying that she was upset about the way Warner treated her because she was helping him out so much and felt things were one-sided. Epperson asked if she wanted him to come over, and she said yes, so he could keep her company.

Krueger testified that on January 29, she woke at about 8:00 a.m.[13] and Epperson arrived soon thereafter. That day she smoked marijuana but did not use methamphetamine, contrary to Epperson's testimony. During the day she was "periodically" in her bedroom with the door closed, and Kayleigh was in another room watching a movie. That afternoon, at about 4:00 or 4:30, Krueger was in her bedroom and heard Warner say, "[W]hat happened, did you throw up?" Krueger, who was under the effects of "coming down" from methamphetamine and high from smoking marijuana, went into the bathroom where Kayleigh was, and saw vomit on the floor, brown liquid in the sink, and a measuring cup on the floor in which Warner had a tobacco pipe soaking in water and Windex. Kayleigh said she was thirsty and that she got new water. As far as Krueger knew, that was the first time Kayleigh vomited that day.

Krueger testified that she wanted to call poison control because she thought Kayleigh had swallowed tobacco; Warner said no, that it was okay and that Kayleigh just needed to throw up and that they should give her

---

[13] On February 5 and 15, 2014, in recorded telephone calls with her father, Krueger said she had been awake for 30 hours, since she last used methamphetamine, when she fell asleep on the morning of January 30. In his interview with Detective Hess, Warner said that he and Krueger slept a full 12 hours, from 4:00 a.m. to 4:00 p.m. on January 30, because they had been up for a couple of days beforehand.

water.  Epperson reminded Krueger that when Kayleigh was a baby she had eaten half a cigarette, Krueger had called poison control, which told her that she would throw up and to give her water.  So she gave Kayleigh water, and Warner put his finger in her throat a couple of times to get her to throw up.  Kayleigh threw up about six times; the last time was while the police were there that evening.  Kayleigh was sitting in Krueger's lap when she vomited; the vomit was red from Pedialyte that she had given Kayleigh, and it got on Krueger's clothes.

Krueger said she told the police that Kayleigh had been throwing up; they said they were done with her and that she should go get cleaned up.  The police left while she was in the shower, with Kayleigh sitting in the tub playing.  Warner knocked on the bathroom door, and Krueger clung to him and cried because she was afraid Kayleigh would be taken away because of the drugs in the house.

Krueger did not notice anything unusual about Kayleigh while she was in the tub.  The only bruises she saw were bruises she knew about:  a few on her lower back, two little ones on her chin, and one on her forehead.  Kayleigh had told her the bruises were from bumping her head on the table or from her bike.  Previously, before her hand was slammed in the door, Warner had told her that Kayleigh had jumped up from the toilet to hug him, and they bumped heads, giving him a swollen eyebrow and Kayleigh a black eye.  The black eye had gone away by January 29.

After Krueger put Kayleigh to bed, Kayleigh woke up a few times whining that she was thirsty.  Krueger gave her Pedialyte, thinking that the tobacco she had drunk was gone and she was waking up thirsty from having thrown up so much.

Krueger did not sleep until about 4:00 in the morning on the 30th. When she went to bed, Kayleigh was in the bathroom with Warner. Krueger woke at 4:00 in the afternoon. She had expected to find Kayleigh in bed with her, looked at her phone to see what time it was, and then, concerned that she had slept so long, went to find Kayleigh, who she found on the bathroom floor lying on her stomach. Krueger thought she was asleep, and went back to the bedroom and asked Warner, who was waking up, why Kayleigh was sleeping on the floor. Krueger went back to check on her, called her name, and went to shake her, but realized that Kayleigh was dead when she touched Kayleigh's leg, which was cold and stiff. There was a bruise on Kayleigh's bottom that she had not seen before.[14] She started screaming that Kayleigh was dead and started to pick Kayleigh up. Warner ran into the bathroom and took Kayleigh from her arms. He started shaking Kayleigh and poking at her stomach, and said, look, she's breathing. Krueger told him to stop and give Kayleigh to her, which he did. Krueger said they needed to call 911. Warner said he needed 10 minutes to process what had happened, and he took Kayleigh and put her on her bed.

When Krueger asked for her phone to call 911, Warner said the police would think he did something to Kayleigh because of the bruise on her bottom. He told Krueger that the day before, Kayleigh had gotten out of a time out early, and he spanked her, but he didn't think he had spanked her hard, but apparently he had. Krueger told him a spanking would not kill Kayleigh and there must have been more Windex in the cup, which she must have drunk and which poisoned her. Krueger testified at trial that she still believed that Kayleigh died from drinking the Windex and tobacco solution.

_____

[14] Krueger testified that she did not see other bruises on Kayleigh when she found the body.

Although Krueger had told Detective Hess in her interview that she was in and out of Kayleigh's room after she found Kayleigh on January 30 and on January 31, she testified at trial that Warner would not let her into Kayleigh's room until after she took Kayleigh's body from the freezer.

On Friday afternoon, Warner said he needed to get out of the house, so they went for a walk, and ended up at Target, where Warner bought ice cream. They returned to the apartment, and late that night or early Saturday morning, Valdez and his brother came over at Warner's request. The four of them talked in Valdez's car. Warner said that Kayleigh had drunk something and died, and that he needed help to get away and get rid of her. Krueger was crying, and Valdez yelled, why didn't you call the police. Krueger told him that she wanted to. She testified that she did not call, and asked why not, she testified that Warner had her phone.

After Valdez and his brother left, as Krueger was dozing off, she heard Warner say something about the freezer. She awoke at about sunrise and could not recall whether he had actually said that; she asked him if Kayleigh was in the freezer. When Warner said yes, she went to the kitchen, opened the freezer, took out the bag with Kayleigh's body, and removed the body from the bag. She noticed the body had a red, purplish color on the side that had been lying on the floor.[15] She put Kayleigh's body back in her bed, under blankets.

Later that morning, they left the apartment. One of the last things Krueger did before leaving was pack a bag of "special clothes of Kayleigh's

---

[15] Krueger testified that although she had since seen photographs that show bruises all over Kayleigh's body, including on her stomach, she did not see other bruises when she found the body or when she took the body from the freezer and laid it on the bed.

and hospital clothes and first birthday clothes." The bag was marked "Please give to my mom." After leaving the apartment, Krueger and Warner tried to sell some video game equipment at Game Stop to get money, and then went to Home Depot where she arranged with Vasquez to give them a ride to Vallejo. Warner had told her they should go to Vallejo, and she assumed that was to get a bus, but she didn't know where they would go from there. Warner told her he would give her the phone and let her call the police when they got out of town.

At Vallejo, they took a bus to the El Cerrito Del Norte BART station, arriving at about 1:30 p.m. on Saturday, February 1. They took BART to San Francisco and went into a fast food restaurant, where Warner gave her phone back and said she could call the police. She turned on the phone and saw dozens of messages, and she knew that the police had found Kayleigh. She told Warner she wanted to go back to Napa and go to the police station herself rather than calling. Warner said he would go with her, but as they started walking back to the BART station, Warner said he wanted to go to the beach and smoke some marijuana that Krueger had with her, and then they would head back. So they went to the beach, and later took BART to SFO. It was too late to get a bus to Napa, so they went to the airport where they sat on chairs for the rest of the night. Krueger added that "before the airport, we were gonna go to a church." The next day they took BART back to El Cerrito Del Norte, where they were arrested.

Krueger testified she had spanked Kayleigh just three or four times in her life, with an open hand on Kayleigh's bottom. She did not yell at Kayleigh during the last week of her life, except on January 29, when she was on the couch with Kayleigh trying to get her to eat a Pedialyte popsicle to rehydrate her. Warner came out of the bedroom and said to Kayleigh, are

41

you not listening to your mom, at which point Kayleigh took a bite from the popsicle.  Krueger said she was not concerned that Kayleigh was seriously ill, but just worried about dehydration and noted that it was unusual for Kayleigh to refuse to eat a popsicle.

Krueger admitted that Kent and Patterson each expressed dislike for Warner, who they characterized as arrogant.  Her father disliked Warner because he thought Warner should be working.  In January 2014, Krueger and her father fought about the fact that he thought she was using drugs and that he didn't approve of Warner living in her home.

Krueger admitted that child protective services (CPS) was supervising her with Kayleigh from the time Kayleigh was five months old until she was almost two.  She also admitted that during that time Jason went to prison for an incident that occurred when he came to her apartment, grabbed her arm, and twisted it.  She told her CPS worker that she had lied to the police, and that Jason had not assaulted her but had been jumped by gang members.  She admitted at trial that what she told CPS was a lie.  The truth was that she had fought back when Jason assaulted her and it had left marks on him, and she and Jason were concerned that she would get in trouble with CPS for fighting him.

Krueger testified that Warner did not physically abuse her as Jason had; the only physical injury she ever received from Warner was the injury to her hand when the door slammed, and she did not know whether that was intentional on his part.  Unlike Jason, Warner did not try to prevent her from seeing her friends.

3.    *Expert Testimony*

Marriage and family therapist Linda Barnard testified as an expert in intimate partner battering and the psychological concept of dissociation.

42

Intimate partner battering creates "coercive control" even if physical force is absent. Abuse followed by kindness creates a bond, which is enhanced by isolation of the victim from other support.

"Cumulative traumatic stress" leads to changes in the brain. Memory of a traumatic event may be disordered and inconsistent. Perception may be altered. A person who has been the victim of trauma, including intimate partner battering, and who suffers a traumatic event, like finding their child dead on the floor, might not notice aspects of the child's body, such as bruising.

Dr. Barnard testified that dissociation is commonly part of a response to trauma, whether cumulative trauma or an extremely traumatic event. A dissociative response can include a failure to register information about a traumatic event and loss of memory of details surrounding a traumatic event. The person may be unable to describe events in sequence or may remember some things but not others. A person in a dissociative state "feels like they're split off from their feelings," or "their behaviors show that they're somehow not connected to the behaviors that they're doing, that there's a disconnection there," but might be able to negotiate with a cab driver for a ride, or perform routines tasks, like laundry. A person undergoing an extreme dissociative episode cannot function, but more commonly, a person in a dissociative state has a flat affect even when talking about the traumatic event.

After interviewing Krueger, reviewing a transcript of Krueger's testimony, and the video of Krueger's interrogation by Detective Hess, as well as various police reports, medical reports, Kayleigh's autopsy report, and a receipt from Target, Dr. Barnard diagnosed Krueger as suffering from posttraumatic stress disorder with depressive symptoms. Dr. Barnard opined that Krueger experienced multiple traumatic events in her life, including

43

being involved in two relationships that included intimate partner battering: one with Jason Slusher, characterized by numerous incidents of physical violence, and one with Warner characterized by strident arguments and three incidents of physical violence.[16]  Dr. Barnard opined that the trauma affected Krueger's memory, perception, behavior, outlook and beliefs, that Krueger went into a dissociative state upon finding Kayleigh dead, and that the dissociation was probably prevalent for the first few days, including the first days after her arrest, and intermittent from then on.

## D.    Rebuttal

Psychiatrist Mikel Matto, an expert in dissociative disorders, the effects of trauma, and intimate partner battering, opined that Krueger had a demonstrated history of abuse from Jason that impaired her reasoning and judgment, but that she did not have such a history with Warner, and that there was no evidence that her relationship with Warner affected her like the relationship with Jason.  Dr. Matto said that when he interviewed Krueger in March 2017, she described a dissociative episode that lasted almost three months from her discovery of Kayleigh's body, but Dr. Matto did not believe that Krueger was actually in a dissociative state.  Dr. Matto opined that Krueger's behavior during that period, as reflected in her actions and appearance in the videos, including those from Target and SFO (which Dr. Barnard had not viewed), and her recall of details when she was interviewed by Detective Hess, were inconsistent with dissociation.

---

[16] Dr. Barnard opined that other traumatic events in Krueger's life included experiencing violence in her home growing up, abandonment issues with her parents, physical and verbal abuse from her father, being molested multiple times by a boyfriend's father, being the victim of a rape by two men at the age of 14, and experiencing a car accident.  Krueger had testified to these incidents.

**E. Verdict and Sentencing**

The jury found Warner guilty of both murder and assault resulting in the death of a child under eight years old, and found true the special circumstance of torture. Warner was sentenced to life in prison without the possibility of parole for the murder charge. His sentence of 25 years to life on the assault charge was stayed under section 654. He timely appealed.

**DISCUSSION**

**A. Evidence to Support the Verdict**

Warner argues that the record contains no substantial evidence that he had the intent to torture that was required for his conviction for first degree torture murder or the intent to kill required for the torture special circumstance. We conclude that substantial evidence supports the torture murder verdict, but we agree with Warner that there is not substantial evidence to support that he had the intent to kill, and therefore we shall reverse the jury's true finding that the special circumstance was true.

1. *Standard of Review*

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.] The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other

45

innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]" ' " (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054.)

2.  *Analysis*

a.  *First Degree Murder*

A conviction for first degree murder under the theory that the murder was by torture requires proof of "(1) acts causing death that involve a high degree of probability of the victim's death; and (2) a willful, deliberate, and premeditated intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose." (*People v. Cook* (2006) 39 Cal.4th 566, 602.) "The intent to torture 'is a state of mind which, unless established by *the defendant's own statements* (or by another witness's description of a defendant's behavior in committing the offenses), must be proved by the *circumstances surrounding the commission of the offense* [citations], which include the *nature and severity of the victim's wounds.*' " (*People v. Mungia* (2008) 44 Cal.4th 1101, 1137.) The severity of the wounds must not be given undue weight, because "severe injuries may also be consistent with the desire to kill, the heat of passion, or an explosion of violence." (*Ibid.*)

Reviewing the record in the light most favorable to the judgment, we conclude there is ample evidence to support a finding of deliberate and premeditated intent to cause extreme pain or suffering for a sadistic purpose.

Warner does not dispute that Kayleigh's death was caused by injury that was inflicted by him or Krueger or both of them. He argues there is no

"specific evidence" as to which defendant inflicted the fatal injury and suggests that the evidence points to Krueger rather than to him. But the evidence points to both of them. Warner claims that Fermin Cisneros heard Krueger, not Warner, hitting Kayleigh, but that is inaccurate. Fermin Cisneros testified she heard Krueger hitting Kayleigh on one particular occasion, but she also testified that "they" (that is, Krueger and Warner) would hit Kayleigh. Warner points to Krueger's history of violence, which is undisputed, but there was also evidence that he spanked Kayleigh so hard he left marks on her and that he had pushed Krueger against a door and then punched the door next to her face so hard as to leave two holes. Both Krueger and Warner denied beating Kayleigh and each denied seeing the other beat her, but it remains undisputed that she was beaten.

The medical experts agreed that the fatal injury or injuries occurred between the police visits to Krueger's apartment on January 27 and 29. During that time, the only people who had access to Kayleigh were Krueger, Warner, Epperson and the friend Krueger visited on January 27 after the police visit, and there is no evidence or suggestion that Epperson or the other friend laid a hand on her. That leaves Warner and Krueger, who were in Krueger's 585-square-foot apartment for most of that time with no one present but Kayleigh. The jury could have inferred that the injuries were inflicted by Warner, or Krueger, or both of them. If the fatal injuries were inflicted by Krueger, the jury could have inferred that Warner not only knew about them, but also assisted Krueger in inflicting them or encouraged her actions, since the injury required "severe" force, which would no doubt have provoked an audible reaction from Kayleigh even if the force itself could not be heard; the apartment was only 585 square feet; and noises in the apartment carried to neighboring units, and would therefore be heard within

47

the apartment as well. And apart from the evidence that Warner himself disciplined Kayleigh, there was evidence from Fermin Cisneros that he joined in Krueger's disciplining her.

There is evidence of sadistic intent in the sheer number of bruises that covered Kayleigh's small body as a result of a beating or beatings that occurred within days or hours of her death: 41 separate injuries, of which 8 to 15 were on her abdomen. The bruising, which resulted from moderate to severe force, was consistent with beating, not with accidental injury or spanking. And there was evidence of prolonged deterioration of Kayleigh's health, including abuse and attempts to conceal it. In addition to the injuries inflicted on Kayleigh shortly before her death, Kayleigh had injuries that occurred longer ago, including a broken rib, and there is evidence from family members and neighbors that she had exhibited a number of bruises in the weeks before her death and that Krueger and Warner gave conflicting accounts of them. Dr. Crawford-Jakubiak testified her injuries, the result of repeated episodes of blunt-force trauma, were "far beyond" what would commonly be suffered by a three-and-a-half-year-old, despite a litany of repeated excuses, like falling off a bike, bumping a head on the table, tripping over a clothes hamper, hitting a chin on a bathtub, or an overly energetic embrace while Kayleigh was sitting on a toilet seat. Toward the end of her life Kayleigh also exhibited an unusually subdued demeanor. Kayleigh played outside less often, and when she did, she was often alone. In the last month of her life, Kayleigh indicated to at least three different people that she did not want even to be at Krueger's apartment.

There is also evidence that Warner was well aware of the injuries to Kayleigh and the pain they caused, and his callous indifference suggests, not deference to Krueger's role as Kayleigh's parent, but rather the desire and

intent to cause pain and suffering. (*People v. Misa* (2006) 140 Cal.App.4th 837, 843.) Warner admitted to Detective Hess that he had known that Kayleigh had bruises for at least a week before she died, and that at the time of the January 29 welfare check, he was aware that she was covered with bruises. Yet he said nothing about that to the police, and remained silent when Krueger falsely told them that Kayleigh had the flu. Apart from his admitted knowledge of the extensive bruising, the jury could infer that Warner was aware that Kayleigh was in pain because even though she was just three-and-a-half when she died, she was fully able to communicate how she felt, as shown by her interactions with Krueger, Robin, Epperson, Officer Chambers, and Warner himself. There was evidence from Dr. Crawford-Jakubiak that Kayleigh would have demonstrated pain from her broken rib and fatal injuries and would have communicated what happened to her, and jurors could infer that Kayleigh did indeed communicate about it, and that the computer search for "stabbing pain next to bellybutton" was conducted in response to a complaint from Kayleigh.

There is evidence of Warner's sadistic intent in leaving Kayleigh alone in the bathroom on the morning of January 30, despite her extensive bruising and the fact that she had vomited extensively the day before. The jury could infer sadistic intent from Warner's practice of requiring Kayleigh to sit on the toilet for lengthy periods until she relieved herself, and his instruction that she remain in her highchair and finish eating after Kayleigh said she was full and threw up.

Warner's conduct after Kayleigh's death provides further evidence that he had acted with sadistic intent. Even if the jury believed that Warner had put Kayleigh's body in the freezer to preserve evidence, the jury had evidence of Warner's treatment of the body that was consistent with sadistic treatment

49

of her while she was alive: he told Detective Hess that hours before he put her body in the freezer, he had folded it and placed it in a plastic bag and in a suitcase in her bedroom, where it remained for some time, and he asked his friends for help getting rid of the body. Warner's conduct after Kayleigh's death also provides evidence that he acted with deliberate and premediated intent. He went out to get ice cream, and ate it. Despite his friend's insistence that he call the police, he failed to do so, and instead tried to flee with Krueger. The flight was not precipitous: Krueger testified that she found Kayleigh's body and awakened Warner on the afternoon of January 30, but they did not flee until the morning of February 1. He took time to pack his things, including a PlayStation that he and Krueger tried to sell at a local store. And the jury could have inferred that he and Krueger worked together to conceal evidence, as reflected in the latex gloves found in the apartment and the fact that he and Krueger left the apartment with a bag that was never found. Warner did not appear to be in any distress in video footage taken after Kayleigh's death. Before they were arrested, he and Krueger took BART to San Francisco, where they went to a fast food restaurant and then to the beach. On the day they were arrested, they had gone to a restaurant for breakfast. On the drive to the police station after his arrest, Warner was quiet except for a comment about a "cool" paint job on an old car.

We agree with the Attorney General that a reasonable juror could have concluded that as Krueger and Warner increased their use of methamphetamine, they found Kayleigh to be an annoyance and obstacle to their drug use. Eventually, Krueger and Warner were screaming at her to be quiet, as heard by a neighbor. In light of Kayleigh's injuries and Krueger's and Warner's conduct, the jury could conclude that they took to beating her with premediated and deliberate intent to cause pain for the sadistic purpose

50

of persuading the toddler to simply be quiet and leave them alone, escalating their assaults over time to achieve their aim when screaming at her or leaving her alone in a room with a movie was not enough.

In sum, the jury could reasonably have inferred that Warner acted with a sadistic intent to cause Kayleigh pain and suffering from evidence of the number and severity of Kayleigh's injuries and Warner's behavior before and after Kayleigh's death. Because we conclude that substantial evidence supports the verdict of first degree murder under a torture murder theory, we do not reach Warner's argument that in the absence of such evidence the judgment may not be reduced to second degree murder.

b. *Torture Special Circumstance*

The torture special circumstance, as set forth in section 190.2, subdivision (a)(18), requires proof of first degree murder and proof "that defendant *intended to kill* and had a torturous intent, i.e., an intent to cause extreme pain or suffering for the purpose of revenge, extortion, persuasion, or another sadistic purpose." (*People v. Streeter* (2012) 54 Cal.4th 205, 237, italics added.) "The relevant inquiry . . . is whether defendant harbored an intent to kill when he tortured" the victim. (*People v. Jennings* (2010) 50 Cal.4th 616, 647.) As with intent to torture, there is rarely direct evidence of intent to kill, which must usually be derived from the circumstances, including the defendant's actions. (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

In the context of concluding that substantial evidence supports Warner's conviction for murder by torture, we have explained that the record contains substantial evidence that Warner acted with a torturous intent. We turn now to the intent to kill. Warner argues that even if we affirm the murder conviction, we must strike the special circumstance finding because

51

the evidence here, all of which is circumstantial, is insufficient to support a finding that he had the requisite intent to kill. We have carefully reviewed the record and agree that the special circumstance finding must be reversed.

The evidence that supports the first degree murder by torture conviction does not necessarily support the requisite intent to kill. The large number of bruises to Kayleigh's body, including bruises to places other than her abdomen evidence the intent to cause pain, but not necessarily intent to kill. Warner's failure to contact the police after Kayleigh's death, his preventing Krueger from contacting them, and his flight with her are evidence of consciousness of guilt and of premeditated conduct, but not necessarily evidence of intent to kill. Warner's knowledge that Kayleigh was extensively bruised shows awareness of the horrible pain Kayleigh suffered, but does not necessarily support an inference of the intent to kill Kayleigh. The evidence that he tried to determine exactly what Kayleigh had ingested, tried to induce vomiting after learning she had drunk tainted water, and then tried to get her to eat popsicles with electrolytes is inconsistent with an intent to kill, because it supports the inference that although Warner wanted Kayleigh to be quiet and leave him and Krueger alone, and took drastic steps to do so, he did not want Kayleigh to die.

We conclude that the record does not contain substantial evidence to support a finding that Warner acted with the intent to kill; in other words, we conclude that a reasonable jury could not be convinced that the only reasonable conclusion supported by the circumstantial evidence was that Warner had the intent to kill, as required by CALCRIM No. 705, with which

52

the jury was instructed.[17]  Therefore we reverse the jury's finding that the special circumstance was true.

c.    *Warner's Failure to Seek Medical Care for Kayleigh*

In contending that the verdict is not supported by substantial evidence, Warner argues that his failure to seek medical aid for Kayleigh cannot give rise to liability for first degree torture murder and that his conviction cannot be upheld on that ground.  This argument is of no avail, because it is based on the incorrect assumption that Warner's failure to seek medical care was the legal theory supporting his conviction—an assumption that pervades his arguments on appeal and that we address further in sections E and F, below.  As we have discussed, Warner's failure to seek medical care for Kayleigh is simply evidence of his intent, and it is by no means the only evidence of his intent.

d.    *Intent and Warner's Methamphetamine Use*

In arguing about the purported lack of evidence to support findings of intent, Warner suggests that he could not have formed any requisite specific intent between January 27 and 29.  He argues that the evidence showed he "was under the influence during much of the period between January 27 and January 29," and that if he did anything to Kayleigh during that time "he was almost surely 'high' when he did so."  Warner conveniently disregards the substantial evidence that even if he was "under the influence," he was able to think clearly and formulate intent.  For example, after the police visit on January 27, he sent a coherent text to Krueger describing what he had

_____

[17] CALCRIM No. 705 instructs that before relying on circumstantial evidence to conclude that the defendant had the intent or mental state required for the special circumstance, the jury must be "convinced that the *only* reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent or mental state."  (Italics added.)

done that morning. On January 28, after Krueger fainted, Warner advised her to lie down, made her soup, and said he would take care of Kayleigh. And Warner himself told the police that when he saw Kayleigh in the bathroom on January 29, before the police arrived, he questioned her carefully and strategically to "get a real answer out of her."

All of this suggests that Warner had the ability to form intent, and Warner ultimately concedes as much in his appellate briefing. Referring to the fact that he didn't call for help when Kayleigh was throwing up because of his concern about his own legal liability, he argues that his intent was to avoid criminal liability, and not to inflict pain. The jury could well have reasonably believed that he had both intents.

## B.     Prosecution Statement About Reasonable Doubt

Warner argues that his trial counsel was ineffective in failing to object to the prosecution's misstatement of the reasonable doubt standard in rebuttal argument, and that as a result the convictions must be reversed. We conclude that Warner has failed to show ineffective assistance of counsel.

1.     *Additional Background*

a.     *Jury Instructions*

As part of the instructions given to the jury before closing arguments, the trial court explained:

"A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt.

"Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true." (See CALCRIM No, 220, "Reasonable Doubt.")

The instructions about circumstantial evidence included CALCRIM No. 224, "Circumstantial Evidence: Sufficiency of Evidence"; No. 704 "Special Circumstances: Circumstantial Evidence—Sufficiency"; and No. 705, "Special Circumstances: Circumstantial Evidence—Intent or Mental State." The substance of those instructions is contained in CALCRIM No. 224:

"Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

"Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

b.      *Closing Arguments*

Warner's counsel argued in closing that there was no evidence as to certain elements of the crimes, and then stated:

"[T]he district attorney is saying that there is circumstantial evidence from which you can infer what I'm saying is the missing elements.

"But before you can use circumstantial evidence each chain in the link of circumstances must be proved beyond a reasonable doubt. . . . Further, . . . the result must be reasonable. It can't be unreasonable. But if there are two equally reasonable results or more . . . you're required by law to reject the interpretation that would indicate guilt for the defendant and to adopt that

55

reasonable interpretation that would reject the idea the defendant was guilty."

In his rebuttal argument, the district attorney responded to defense counsel's discussion of circumstantial evidence, and argued that although the defense had implied that circumstantial evidence was less important or valuable than direct evidence, the jury instructions were clear that circumstantial and direct evidence were both acceptable as types of evidence:

"Neither is necessarily more reliable than the other. Neither is entitled to any greater weight than the other. And how else do you prove an intent in a case other than by circumstantial evidence?

"You have to look at what are the things we know, what's the evidence that we know happened here? What's the testimony we know? That gives us someone's intent. Because, as I said in my first argument, defendant Warner didn't tell Sergeant Hess I intended to kill Kayleigh, so we have to prove that intent by circumstantial evidence.

"Reasonable doubt simply means the Prosecution's interpretation is reasonable and the Defense interpretation is unreasonable. But there's only one reasonable interpretation of the evidence to lead wherever that takes you and in this case it's guilt. It's guilt."

On appeal, Warner argues that the sentence, "Reasonable doubt simply means the Prosecution's interpretation is reasonable and the Defense interpretation is unreasonable," misstated the reasonable doubt standard and created a reasonable likelihood that the jury would apply a standard less than proof beyond a reasonable doubt by erroneously suggesting that as long as the prosecution's interpretation of the evidence was reasonable and Warner's was not, the prosecution had met its burden of proof. Warner's trial counsel did not object to the district attorney's statement.

56

2.    *Applicable Law and Standard of Review*

To prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and that counsel's failure to meet that standard was prejudicial.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694 (*Strickland*).)

The reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland*, *supra*, 466 U.S. at p. 689.)  Thus, the adequacy of counsel's performance "is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice.  (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260.)

To show prejudice, appellant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, 466 U.S. at p. 694.)

Advocates, including prosecutors, "are given significant leeway in discussing the legal and factual merits of a case during argument."  (*People v. Centeno* (2014) 60 Cal.4th 659, 666 (*Centeno*).)  Thus, a prosecutor may "argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory"; "urge that a jury may be convinced beyond a reasonable doubt even in the face of conflicting, incomplete, or partially inaccurate accounts"; and "argu[e] that the jury must ' "decide what is reasonable to believe versus unreasonable to believe" and to "accept the reasonable and reject the unreasonable." ' "  (*Id.* at p. 672.)  But " 'it is improper for the prosecutor to misstate the law generally [citation],

57

and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].' " (*Id.* at p. 666, quoting *People v. Marshall* (1996) 13 Cal.4th 799, 831.) When attacking a prosecutor's remarks to the jury about the reasonable doubt standard in closing argument, "the defendant must show that, '[i]n the context of the whole argument and the instructions' (*Marshall*, *supra*, 13 Cal.4th at p. 831), there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' " (*Centeno*, *supra*, 60 Cal.4th at p. 667.).) If there is a reasonable probability that the prosecutor's argument caused one or more jurors to convict the defendant based on a lesser standard than proof beyond a reasonable doubt, the conviction must be reversed. (*Id.* at p. 677.)

> 3. *Analysis*

Taken literally and in isolation, the statement of which Warner complains is opaque, to say the least, but nevertheless incorrect. The term "reasonable doubt" may be difficult to define, but it does *not* "simply mean[ ] the Prosecution's interpretation is reasonable and the Defense interpretation is unreasonable."

Although the prosecutor's statement was incorrect, defense counsel could have reasonably concluded that objecting to it would not benefit his client. In the context of the prosecutor's argument taken as a whole, including his opening argument, the defense argument, and the rest of his rebuttal, the remark that is challenged here was not likely to be interpreted as a statement about the definition of reasonable doubt; instead, it was

almost certainly seen as a reference to the instructions concerning the sufficiency of circumstantial evidence, and in particular to the portion of the instructions stating that "when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable." (CALCRIM Nos. 224, 704, 705.) Not only was the district attorney's statement part of his discussion of circumstantial evidence, but also it was immediately followed by this sentence: "But there's only one reasonable interpretation of the evidence to lead wherever that takes you and in this case it's guilt." In these circumstances, defense counsel could have reasonably concluded that an objection would likely result in the district attorney elaborating in his rebuttal on the unreasonableness of the interpretation urged by the defense, at a point in the proceedings when defense counsel had no further opportunity to argue. Accordingly, we do not conclude that defense counsel was deficient in failing to object to the district attorney's remark.

Even if we were to assume that defense counsel's performance was deficient, we would conclude that Warner has not shown prejudice. The Attorney General contends that the statement suggests, to the benefit of the defendant, that there is a reasonable doubt (and therefore the defendant must be acquitted) if the "prosecution's interpretation is reasonable and the Defense interpretation is unreasonable." We doubt that the jury would have interpreted the statement in this way, because it would make no sense for the prosecution to argue such a thing. But we are not persuaded by Warner's argument that the prosecutor's statement created a reasonable likelihood that the jury would apply a standard less than proof beyond a reasonable doubt.

To begin, Warner mischaracterizes the prosecution's statement when he claims "the prosecutor stated that proof beyond a reasonable doubt required only that 'the Prosecution's interpretation is reasonable and the Defense interpretation is unreasonable.' " That is not what the prosecutor said; furthermore, in context the remark was most likely understood as a reference to the instructions about circumstantial evidence, as we have explained.

Further, the jury had been correctly instructed that the prosecution was required to prove guilt beyond a reasonable doubt, and that "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true." Appellate courts " 'presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' " (*People v. Thornton* (2007) 41 Cal.4th 391, 441.) Warner offers us no reason to believe that the jurors disregarded the trial court's instructions and applied a standard less than proof beyond a reasonable doubt, particularly in view of the trial court's instruction that the jury must follow the law as explained by the court (see CALCRIM No. 200, "Duties of Judge and Jury"), the trial court's assurance to the jury that they would be given an original and a copy of the jury instructions to review as they deliberated, and the trial court's statement in connection with its post-argument instructions about greater and lesser crimes and completion of the verdict forms that, "[W]henever I tell you the people must prove something, I mean they must prove it beyond a reasonable doubt." (CALCRIM No. 3517, "Deliberations and Completion of Verdict Forms.")

Warner argues that his case is like *Centeno*, where our Supreme Court concluded that it was reasonably likely that the prosecutor misled the jury

about the applicable standard of proof and "diluted the People's burden" where the prosecutor "did not simply urge the jury to ' "accept the reasonable and reject the unreasonable" ' in evaluating the evidence before it," but instead "confounded the concept of rejecting unreasonable inferences, with the standard of proof beyond a reasonable doubt. She repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence." (*Centeno*, *supra*, 60 Cal.4th at p. 673.) The cases are distinguishable. Most significantly the objectionable portion of the prosecutor's argument in *Centeno* was lengthy and the prosecutor repeatedly suggested that all that was required of the prosecutor was to provide a reasonable interpretation of the evidence; here, in contrast, the prosecutor made a single objectionable statement, which, though inaccurate when taken in isolation, was not misleading when taken in context. As our Supreme Court stated in *Centeno*, "The standard of proof is a measure of the jury's level of confidence. It is not sufficient that the jury simply believe that a conclusion is reasonable. It must be convinced that all necessary facts have been proven beyond a reasonable doubt." (*Id.* at p. 673.) We see nothing in the prosecutor's argument that undermined the requirement that the People prove their case against Warner beyond a reasonable doubt.

## C.     **Pinpoint Instruction on Aiding and Abetting**

Warner argues that the trial court erred in giving the jurors a pinpoint instruction on aiding and abetting. Because his counsel did not object to the instruction at trial, Warner argues that the issues he raises are properly addressed on appeal under Penal Code section 1259, which permits appellate review of any instruction that affects the defendant's substantial rights, even if no objection was made at trial. He further argues that if we conclude that his claims of error have been forfeited on appeal, the forfeiture was the result

of prejudicial ineffective assistance of counsel. We assume, without deciding, that the issues are properly raised on appeal, and we conclude that the challenged instruction was a correct statement of the law and that Warner has not shown that the instruction was misleading or prejudicial. Accordingly, we do not reach the issue of ineffective assistance.

     1.    *Additional Background*

The trial court instructed the jury on aider and abettor liability with CALCRIM No. 400, "Aiding and Abetting: General Principles," and a modified version of CALCRIM No. 401, "Aiding and Abetting: Intended Crimes."[18]

---

[18] The trial court read the instructions to the jury as follows: "A person may be guilty of a crime in two ways: One, he or she may have directly committed the crime, and I will call that person the perpetrator; two, he or she may have aided and abetted a perpetrator who directly committed the crime. The person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator. [¶] To prove that a defendant is guilty of a crime based upon aiding and abetting that crime, the People must prove that: One, the perpetrator committed the crime; two, the defendant knew that the perpetrator intended to commit the crime; three, before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing the crime; and, four, the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does in fact, aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime. If all of these requirements are true the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor. [¶] If you conclude that the defendant was present at the scene of the crime or failed to prevent the crime you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or in the absence of a legal duty fails to prevent the crime does not by itself make him or her an aider and abettor."

The prosecutor requested, and the trial court gave the jury, a supplemental pinpoint instruction on aiding and abetting drawn from *People v. Culuko* (2000) 78 Cal.App.4th 307, 321 (*Culuko*):

"Those who aid and abet a crime and those who directly perpetrate the crime are principals and equally guilty of the commission of that crime.

"You need not unanimously agree nor individually determine whether a defendant is an aider and abettor or a direct perpetrator. The individual jurors themselves need not choose among the theories so long as each is convinced of guilt. There may be a reasonable doubt that defendant was the direct perpetrator and a similar doubt that a defendant was the aider and abettor, but no such doubt that a defendant was one or the other."

2.      *Applicable Law and Standard of Review*

We review the legal adequacy of a jury instruction de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1211 (*Cole*).) "In reviewing a claim that the court's instructions were incorrect or misleading, we inquire whether there is a reasonable likelihood the jury understood the instructions as asserted by the defendant." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.) We consider the instructions as a whole, in the context of the trial record and arguments of counsel. (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1312.) We " ' "assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " and we interpret the instructions " 'if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

3.      *Analysis*

Warner raises two challenges to the pinpoint instruction, which we consider in turn.

First, he argues that by telling the jurors they were not required to "individually determine" whether he was an aider/abettor or direct perpetrator, the pinpoint instruction implied that the jurors were not required to apply the principles set forth in the aiding and abetting instructions and therefore amounted to a failure to give any instructions on aiding and abetting. He contends that the instruction violated his Sixth and Fourteenth Amendment rights by permitting the jurors to "bypass" CALCRIM No. 401 and convict him based on proof insufficient to meet the standard of guilt beyond a reasonable doubt.

The language at issue in the pinpoint instruction is an accurate statement of the law, as reflected in *People v. Santamaria* (1994) 8 Cal.4th 903 (*Santamaria*), the source of the language in *Culuko* that the trial court adopted here. (*Culuko, supra*, 78 Cal.App.4th at p. 323-324.) In *Santamaria*, our Supreme Court stated, "Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. Sometimes, as probably occurred here, the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be a reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other." (*Santamaria, supra*, 8 Cal.4th at p. 919.)

Warner argues in a conclusory fashion that even if the language is an accurate statement of the law it created a reasonable likelihood that jurors would vote to convict without going through the elements of aider and abettor liability as set forth in CALCRIM No. 401. We reproduce his argument here: "After all, if a juror understands that he need not pick any particular theory, why would that juror believe it necessary to assess the defendant's guilt

64

under an instruction which sets forth that theory?  Instead, a juror who had reasonable doubt whether Warner was the actual killer could just skip the messy details of the aiding and abetting instruction, and vote to convict because that juror was 'convinced of guilt.' "  This argument makes no sense. Warner disregards the principle that individual instructions are not considered in isolation.  The pinpoint instruction was read immediately after CALCRIM Nos. 400 and 401.  We have no reason to believe that the jurors, who were instructed with the elements of murder by torture (CALCRIM No. 521) and assault causing death of a child (CALCRIM No. 820), as well as the general principles of aider/abettor liability (CALCRIM No. 400), and the elements of aider and abettor liability (CALCRIM No. 401), would ignore those instructions.  The pinpoint instruction was unambiguous that each juror must be convinced beyond a reasonable doubt that Warner was guilty as "one or the other":  that is, as a direct perpetrator or as the aider and abettor.  For a juror to reach the conclusion that Warner was "one or the other," the juror would have to refer to the CALCRIM instructions about the elements of the crimes and the elements of aider and abettor liability.  The pinpoint instruction cannot reasonably be read as telling the jurors to disregard the other instructions on aiding or abetting.

Warner's second challenge to the pinpoint instruction is that by instructing the jury that a perpetrator and an aider and abettor are "equally guilty," the trial court allowed him to be convicted of first degree torture murder and the special circumstance based on Krueger's intent rather than his own, and thereby violated his Sixth and Fourteenth Amendment rights. The substance of his challenge is that the trial court gave the jury an incorrect instruction on the intent element of aider and abettor liability.

65

Our Supreme Court has recognized that "[a]ll principals, including aiders and abettors, are 'equally guilty' in the sense that they are all criminally liable" and has also recognized that in some cases, a statement characterizing all principals as "equally guilty" could be misleading as part of jury instructions. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433.) Here, considering the pinpoint instruction in the context of the other jury instructions, we see no reason to believe that the jury believed it could convict Warner of first degree torture murder on the theory that he was an aider and abettor without concluding that Warner himself had the requisite intent.[19]

In his closing argument, the prosecutor discussed at some length the issue of intent to torture, and argued that the evidence showed that Warner had the required intent.

By its terms, the pinpoint instruction refers to aiding and abetting with respect to a particular crime: "Those who aid and abet *a crime* and those who directly perpetrate *the crime* are principles and equally guilty of the commission of *that crime*." (Italics added.) The language is best interpreted as referring back to CALCRIM No. 400, which states, "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." Thus, the pinpoint instruction simply emphasizes that, whether a person is a perpetrator of a crime or an aider and abettor of that crime, the person is guilty of that crime. Both the pinpoint instruction and

---

[19] Because we have already concluded that insufficient evidence of intent to kill requires reversal of the special circumstance finding, we do not address Warner's argument about the jury instructions as it pertains to the special circumstance.

CALCRIM No. 400 are silent on the issue of intent, which is addressed in CALCRIM No. 401.

CALCRIM No. 401 is unambiguous that to be guilty of a crime as an aider and abettor, a defendant must *know* that the perpetrator *intended* to commit that crime, and must himself *intend* to aid and abet the perpetrator in committing that crime. Thus, the instruction is clear that if Krueger is the perpetrator of first degree murder by torture, which is the crime being considered, her intent, though relevant to deciding whether aider and abettor liability attaches to Warner, is not in itself determinative of his liability.

Further, we do not consider the pinpoint instruction, or even the aiding and abetting instructions, in isolation. We interpret the instructions together with the instruction on the elements of murder by torture (CALCRIM No. 521), which state that murder by torture requires intent to inflict extreme and prolonged pain on the victim while the victim was alive as well as intent to inflect that pain for a sadistic purpose. Thus, to convict Warner of murder by torture as an aider and abettor, the jury had to find that Warner knew that Krueger acted with the intent to torture and that Warner intended to, and did, aid, facilitate, promote, encourage or instigate the crime of murder by torture.

As Warner observes, the jury submitted two questions to the trial court asking whether certain portions of instructions pertain to only a perpetrator or also to an aider and abettor.[20] He contends that the questions show that

---

[20] The jury's first question concerned part 1 of the instruction for the special circumstance (i.e., to prove the special circumstance true, the People must prove that "The defendant intended to kill Kayleigh Slusher"). The jury's question was in two parts. The first part was, "For the special circumstance, does 'defendant' in part 1 of the instruction apply to only the perp or also an aider & abet[o]r. Please clarify." The second part was, "Does intent to kill require a thought process or can it simply be behaviors resulting

67

the jury failed to understand how CALCRIM No. 401 "incorporates the crime's underlying elements," and that the jury's failure of understanding likely extended to whether an aider and abettor must possess necessary specific intent. We interpret the questions as showing that the jurors appreciated the complexity of the issues before them. They were considering carefully not only whether Warner was a perpetrator or aider and abettor with respect to the crimes charged, but also how each of the elements outlined in the instructions, including but not limited to those concerning intent, applied to perpetrators and aiders and abettors.

Finally, we note that in addition to arguing that there was only weak evidence of his own intent to torture, Warner suggests that a properly instructed jury might well have concluded that Krueger struck Kayleigh and

---

in death. Please clarify." It is apparent that the jury puzzled over the issue of intent to kill. Although Warner did not object at trial to the trial court's response, he argues on appeal that the response was erroneous and that if we conclude his claim of error is forfeited, he was denied effective assistance of counsel. In view of our conclusion that the jury's finding of intent to kill is not supported by substantial evidence, we do not reach these arguments.

The jury's second question concerned part 2 of the instruction for assault causing death of a child (i.e., to prove the defendant guilty of the crime, the People must prove that "The defendant did an act that by its nature would directly and probably result in the application of force to the child"). The question was, "For Charge 2: Assault Causing Death of Child, part 2 of instruction, does the section "the defendant did an act" refer to only the perp, or can it also apply to an aider & abet[o]r? Please clarify." Notably, in its response to the jury's second question, the trial court included the following language: "An aider and abettor is liable for the acts of the perpetrator, and guilty of the crime charged, if you find the elements of aiding and abetting have been met. See CALCRIM 400, 401, and the aiding and abetting pinpoint instruction." The final sentence of the response further undermines Warner's argument (which we have already rejected) that the jury would interpret the pinpoint instruction as permitting them to bypass the elements of aider and abettor liability.

68

that he stood by and did nothing "because he felt that disciplinary matters were largely within her domain and it was not his place to interfere," and that Warner implied as much in his interview with Detective Hess, where he said that he responded to Krueger's asking whether they should call poison control by saying, "Should we? . . . This is your daughter, you tell me." Even leaving aside our conclusion that Warner has not shown error in the pinpoint instruction and our rejection of his premise that the jury was not properly instructed, Warner's suggestion rings hollow in light of the overwhelming evidence that he took an active part in many aspects of Kayleigh's life, including day-to-day care, and toilet training, as well as disciplinary matters. It was undisputed that he would lecture Kayleigh, put her in time outs that lasted up to 30 minutes, and spank her hard enough to leave bruises.

**D.     Reference to "Duty" and "Failure to Act" in CALCRIM No. 520**

Warner argues that his murder conviction must be reversed because the jury instructions erroneously allowed the jury to convict him of murder based on the invalid theory that he failed to perform a legal duty, a theory on which, he says, the prosecution had relied in its argument. We are not persuaded.

1.     *Additional Background*

As proposed by the prosecution, CALCRIM No. 520, "First or Second Degree Murder With Malice Aforethought (Pen. Code, § 187)," included references to duty and failure to act, some of which Warner discusses in his appeal. The prosecution's proposed instruction is reproduced below; boldface is used in the references to duty and failure to act. None of the boldface language appeared in the version of CALCRIM No. 520 proposed by the defense.

"The defendants are charged in Count 1 with murder.

69

"To prove that a defendant is guilty of this crime, the People must prove that:

"1. The defendant committed an act that caused the death of another person;

"AND

"2. When the defendant acted, he or she had a state of mind called malice aforethought.

"There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder.

"The defendant acted with *express malice* if he or she unlawfully intended to kill.

"The defendant acted with *implied malice* if:

"1. He or she intentionally committed an act**, or intentionally failed to act in those situations where he or she is under a legal duty to act**.

"2. The natural and probable consequences of the act **or omission or failure to act** were dangerous to human life;

"3. At the time he or she acted, he or she knew his or her act was dangerous to human life;

"AND

"4. He or she deliberately acted with conscious disregard for human life."

"Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time.

"An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

**"A Parent has a legal duty to care for a Child."**

**"If you conclude that the defendant owed a duty to Kayleigh Slusher, and the defendant failed to perform that duty, his or her failure to act is the same as doing a negligent or injurious act."**

"If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No. 521."

During a conference before the trial court on jury instructions, the prosecution acknowledged that the concept of legal duty did not apply to the murder charge against Warner, and, as agreed at the conference, the version of CALCRIM No. 520 given to the jury did *not* include the sentence, "A Parent has a legal duty to care for a Child," or the phrase "or intentionally failed to act in those situations where he or she is under a legal duty to act" in item 1 of the "implied malice" definition. The remaining boldfaced language (i.e., the phrase "or omission or failure to act" in item 2 of the "implied malice" definition and the paragraph that begins, "If you conclude . . . .") was not discussed at the conference and *was* included in the instruction as provided to the jury.

In closing argument, the district attorney never argued that Warner had a duty to Kayleigh, or that Warner was guilty of murder based on his failure to perform any duty.[21]

During the defense closing argument, defense counsel referred in error to instructions concerning Warner's liability for failing to act when he was under a legal duty to act. The court immediately interjected that those were not the instructions provided to the jury.

2.      *Applicable Law and Standard of Review*

The trial court is required to instruct the jury on the principles of law that are "closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.)

Instructions regarding the elements of a crime, including instructions as to malice with respect to murder, affect the substantial rights of the defendant, and are appropriately reviewed on appeal even in the absence of an objection in the trial court. (§ 1259; *People v. Hillhouse* (2002) 27 Cal.4th 469, 503.) We review the legal adequacy of a jury instruction de novo. (*Cole*, *supra*, 33 Cal.4th at p. 1211.)

3.      *Analysis*

As a general matter, a defendant can be criminally liable for failing to act only if the defendant has an existing legal duty to take positive action.

---

[21] The district attorney did, however, argue that the failure to get medical care for Kayleigh and the failure to inform the police during the January 29 welfare check that Kayleigh had drunk something potentially poisonous were evidence to support the finding that Warner had the intent to kill. As we have discussed, however, we conclude that there was not substantial evidence of intent to kill to support a finding of the special circumstance.

(*People v. Heitzman* (1994) 9 Cal.4th 189.)  We agree with the parties that, as a non-parent, Warner is not subject to any duty for the purposes of implied malice murder, and that it was error for the trial court to include language about duty and the failure to act in CALCRIM No. 520.  By including that language, the jury was instructed not only with the valid legal theory that Warner could be convicted of murder on the basis of his acts, but also, though imperfectly and incompletely, with the invalid legal theory that he could be convicted based on his failure to act.

In *People v. Aledamat* (2019) 8 Cal.5th 1, our Supreme Court held that when a jury is instructed with both a valid and invalid legal theory, "[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Id.* at p. 3, citing *Chapman v. California* (1967) 386 U.S. 18, 24.)  We conclude that the error here is harmless, because other aspects of the jury's verdict leave no reasonable doubt that the jury made the findings necessary to convict Warner of murder on a legally valid theory.  (*People v. Chun* (2009) 45 Cal.4th 1172, 1203, 1205.)

Here, the jury found Warner guilty of first degree murder by torture, which means that the jury found that Warner had the intent to torture.  The instructions for first degree murder by torture were explicit that guilt requires performing an act.  (CALCRIM No. 521.)  Likewise, the instructions for aiding and abetting were clear that liability as an aider or abettor requires an act, in the form of "words or conduct."  (CALCRIM No. 401.)  Despite Warner's argument to the contrary, the prosecution did not argue that Warner's failure to seek care for Kayleigh was the basis for a murder conviction.

Finally, Warner contends in passing that the trial court "exacerbated its instructional error by making a similar mistake with CALCRIM No. 401" on aiding and abetting. The instruction ended with the following language, "If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime, or, in the absence of a legal duty, fails to prevent the crime does not, by itself, make him or her an aider and abettor." Warner claims that the phrase "or, in the absence of a legal duty," was prejudicial because it "suggested, through negative implication, that, if a duty does exist, the failure to prevent a crime **may** make someone liable for aiding and abetting." There is no basis for prejudice here. The trial court stated unambiguously that legal duty was not at issue, and in any event the instruction on aiding and abetting, which we have discussed at some length above, did not permit a finding that Warner was an aider and abettor solely on the basis of the failure to act.

## E. Lack of Jury Instruction on Involuntary Manslaughter

### 1. *Additional Background*

Warner's requested jury instructions included CALCRIM No. 580, on involuntary manslaughter as a lesser included offense of murder.[22] The instruction as presented in Warner's request contained a blank space for the

---

[22] The relevant portion of the instruction as requested is: "**CALCRIM 580** [¶] . . . [¶] The defendant committed involuntary manslaughter if: [¶] 1. The defendant committed a crime or a lawful act in an unlawful manner; [¶] 2. The defendant committed the crime or act with criminal negligence; AND [¶] 3. The defendant's acts caused the death of another person. [¶] Instruction[s] _____ tell[s] you what the People must prove in order to prove that the defendant committed _____ *<insert misdemeanor[s]/infraction[s]/noninherently dangerous (felony/felonies)>*"

insertion of the action underlying the charge, and the trial court asked defense counsel to provide the missing information, which counsel agreed to do. Defense counsel subsequently withdrew the request, informing the court that he concluded the instruction was not appropriate on the basis of research he had conducted.

On appeal, Warner contends that the trial court committed reversible error by failing to instruct the jury on involuntary manslaughter based on the theory that Warner committed the noninherently dangerous felony of child endangerment. Building further on his unsupported assumption that the jury verdict rested solely on his failure to seek care for Kayleigh, and therefore recognizing that there was "considerable evidence that he helped bring about Kayleigh's death through his inaction," he argues that, even in the absence of a legal duty, a reasonable juror could have found that he "fail[ed] to seek medical care for Kayleigh when her condition was obviously deteriorating." He argues that although the evidence of his failure to seek medical care for Kayleigh did not support a conviction for murder, it could have supported a conviction for felony child endangerment, in which case the proper verdict was involuntary manslaughter rather than murder.

2. *Applicable Law and Standard of Review*

Manslaughter is a lesser offense of murder, distinguished from murder by mens rea. (*People v. Rios* (2000) 23 Cal.4th 450, 460.) Murder requires malice, that is the intent to kill or conscious disregard for human life; in the absence of malice, a defendant may be found guilty of manslaughter. (*Ibid.*) Our Supreme Court has held that "an unintentional homicide committed in the course of a noninherently dangerous felony" is punishable as involuntary manslaughter "if that felony is committed without due caution and circumspection." (*People v. Burroughs* (1984) 35 Cal.3d 824, 835 (*Burroughs*),

overruled on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 89 (*Blakeley*).) A felony is "noninherently dangerous" unless it is "so dangerous that by its very nature, it cannot be committed without creating a substantial risk that someone will be killed." (*Burroughs* at p. 833.)

Felony child abuse is defined in section 273a, subdivision (a), which provides punishment for "[a]ny person who, under circumstances or conditions likely to produce great bodily harm or death, [1] willfully causes or permits any child to suffer, or [2] inflicts thereon unjustifiable physical pain or mental suffering, or [3] having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or [4] willfully causes or permits that child to be placed in a situation where his or her person or health is endangered." (*People v. Valdez* (2002) 27 Cal.4th 778, 783 [quoting § 273a, subd. (a) and adding internal numbering].) Thus felony child abuse includes not only active conduct in the form of direct assault, but also passive conduct in the form of " 'endangering by extreme neglect.' " (*People v. Sargent* (1999) 19 Cal.4th 1206, 1215-1216.) Felony child abuse is a noninherently dangerous felony (*Culuko, supra,* 78 Cal.App.4th at p. 321); and because it incorporates the element of criminal negligence, it is necessarily a felony committed without due caution and circumspection and can serve as the basis of a conviction for involuntary manslaughter under *Burroughs.* (See *People v. Valdez, supra,* 27 Cal.4th at p. 788 [the negligence required for a violation of section 273a, subdivision (a), " ' "must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life . . . or an indifference to consequences" ' "].)

A trial court has a duty to instruct the jury on lesser included offenses "only where there is 'substantial evidence' from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense." (*People v. DePriest* (2007) 42 Cal.4th 1, 50.) Accordingly, if there were substantial evidence from which the jury could conclude that Warner lacked malice, that is, not just that he lacked the intent to kill, but also that he did not act with conscious disregard for life, the trial court would have had the duty to instruct on involuntary manslaughter. In the absence of such evidence, there is no error: "Speculation is an insufficient basis upon which to require the trial court to give an instruction on a lesser included offense." (*People v. Wilson* (1992) 3 Cal.4th 926, 942 [failure to instruct on theft, a lesser included offense of robbery, is not error where there is no evidence to support the theory that the underlying offense, if committed by defendant, was other than robbery].) Failure to instruct on a lesser included offense is prejudicial if there is a reasonable probability that the lack of the instruction affected the outcome. (*Blakeley*, *supra*, 23 Cal.4th at p. 93.)

We review independently the trial court's failure to instruct on a lesser included offense. (*People v. Waidla* (2000) 22 Cal.4th 690, 733 [whether to instruct on a lesser included offense is a mixed question of law and fact that is "predominantly legal" and therefore "examined without deference"].)

3. *Analysis*

Warner fails to show error. He ignores the substantial evidence that shows he acted with conscious disregard for life, a finding that supports implied malice. That evidence includes, for example, Krueger's statement to the police that Warner admitted hitting Kayleigh so hard that he left bruises, Fermin Cisneros's testimony that she heard both Warner and Krueger hit

77

Kayleigh near the end of her life, and Warner's own statements to Detective Hess admitting that he left Kayleigh alone in the bathroom covered with bruises. This evidence, which goes beyond mere inaction, would have resulted in a verdict of second degree murder even in the absence of a finding of the intent to torture. (CALCRIM No. 520.)

Warner concedes that the jury rejected the verdict of implied malice second degree murder on which the court had instructed, and he recognizes that as a result the failure to instruct on involuntary manslaughter was not prejudicial on its own. He therefore argues that the failure to instruct on involuntary manslaughter was prejudicial when viewed in combination with the errors that we analyzed in parts B, C, and D of this discussion. In effect he speculates that in the absence of the alleged errors, the jury would have acquitted Warner of first degree murder and would have then addressed the possibility of a verdict for second degree murder or involuntary manslaughter, and might have opted for involuntary manslaughter if it had understood that Warner had no duty to seek medical care for Kayleigh and therefore a murder conviction could not be based on his failure to seek such care. The argument lacks merit.

We disagree with Warner's premise that the trial court erred in failing to instruct the jury on involuntary manslaughter. Furthermore, of the various errors that Warner has alleged as contributing to prejudice on this issue, the only one we find is the inclusion of language about duty and failure to act in the jury instruction for murder with malice aforethought (CALCRIM No. 520). That error, as we have discussed, was harmless, and does not suffice to show prejudice here.

**F.    Cumulative Prejudice**

Warner relies on the principle that a series of independently harmless trial errors "may in some circumstances rise by accretion to the level of reversible and prejudicial error" (*People v. Hill* (1998) 17 Cal.4th 800, 844) to argue that the alleged errors we analyzed in sections B, C, D and E of this Discussion caused cumulative prejudice on the murder count, and that the alleged error we analyzed in section B, along with one of the errors we analyzed in section C (specifically, the instruction that the jurors were not required to "individually determine" whether Warner was a direct perpetrator or an aider and abettor), caused cumulative prejudice on the count of assault resulting in the death of a child under eight years old.

We shall reverse the special circumstance finding.  We have rejected Warner's other claims of error, except the reference to "duty" and "failure to act" in the murder instruction, which we concluded was harmless. Accordingly, we do not reach Warner's claim of cumulative prejudice.

## DISPOSITION

We reverse the special circumstance finding for lack of substantial evidence, and remand the matter for resentencing.  The judgment is otherwise affirmed.

_____
Miller. J.

WE CONCUR:


_____
Kline, P.J.


_____
Richman, J.


A152049, *People v. Warner*